UNITED STATES of America, Plaintiff,

v.

CITY OF PARMA, OHIO, Defendant.

No. C73–439.

United States District Court,
N. D. Ohio, E. D.

June 5, 1980.

James R. Williams, U. S. Atty., Cleveland, Ohio, Drew S. Days, III, Asst. Atty. Gen., Robert J. Reinstein, Brian F. Heffernan, Michael L. Barrett, Theodore M. Shaw, Dept. of Justice, Washington, D. C., for plaintiff.

Fredric E. Kramer, Cleveland, Ohio, Robert R. Soltis, Parma, Ohio, for defendant.

Avery S. Friedman, Cleveland, Ohio, for amicus curiae.

MEMORANDUM OPINION

BATTISTI, Chief Judge.

On April 27, 1973, the Civil Rights Division of the Department of Justice filed a complaint in this Court, alleging that the City of Parma has engaged in a pattern and practice of racial discrimination in housing in violation of The Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, and furthermore has denied rights granted by the Act to groups of persons.

The government's contention is that Parma, the largest suburb of Cleveland, with a population of more than 100,000, has had,

and continues to follow, a long standing policy of excluding blacks from taking up residence in any substantial numbers. The government contends that this policy was manifested in a series of actions by officials of the City of Parma which were done with the purpose and had the effect of perpetuating Parma's virtually all-white character. Stark statistics show that Parma is well over 99.5% white while adjacent Cleveland has a 38% minority population.

The government's evidence focuses on five series of actions taken by Parma officials between 1968 and 1975, all of which are claimed to have inhibited or prevented blacks from moving into Parma and thereby implemented a policy of racial exclusion. The challenged actions include: 1) Parma's refusal to enact a fair housing resolution which would have welcomed "all persons of goodwill" as residents; 2) Parma's consistent opposition to all forms of public and low-income housing; 3) Parma's rejection of a federally-subsidized low-income housing development; 4) Parma's refusal to submit an adequate housing assistance plan in connection with its application for Community Development Block Grant funds; and 5) Parma's passage and application of four land-use ordinances which impose height, parking and voter-approval limitations on housing developments, with the purpose and effect of severely restricting low-income housing opportunities in the City. These actions, individually and collectively, are alleged to have been taken with the purpose and the effect of perpetuating a segregated community.

Parma denies that its conduct had the purpose or effect of discriminating against blacks. The City's basic defense is that its virtually all-white character is the natural outcome of free choice in the housing market. The City claims that the marked absence of blacks is the result of choice influenced by associational preferences, historical and economic factors, and is not the result of discrimination in housing. The challenged actions are defended by the City on the ground that they advance legitimate municipal interests and are within the discretion normally afforded to the community.

The issues of racially discriminatory motivation, racially discriminatory effect, and Fair Housing Act violations depend on the evaluation of often merged legal and factual questions. The findings which follow are made from a review of all evidence and applicable law, including judicial notice of certain historical facts found in earlier court decisions or in sources whose accuracy cannot reasonably be questioned. *See* Rule 201(b), Fed.R.Evid. For organizational purposes, the findings are grouped into four major areas:

 I. Legal Standards for Determining Violations of the Fair Housing Act;

 II. Racial Housing Discrimination in the Cleveland Metropolitan Area, and Parma;

 III. Parma's Racially Exclusionary Policies and Practices; and

 IV. Violations of the Fair Housing Act.

These findings follow a trial on the issue of liability at which twenty witnesses testified and the depositions of eleven witnesses and over 250 exhibits were admitted into evidence. The remedy issue was pretermitted for a subsequent proceeding if liability were found.

## I. LEGAL STANDARDS FOR DETERMINING VIOLATIONS OF THE FAIR HOUSING ACT

The Fair Housing Act was enacted by Congress in 1968. Pub.L. No. 90–284, Title VIII, 82 Stat. 81 (codified at 42 U.S.C. §§ 3601 to 3631). Its purpose is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Enacted pursuant to congressional power under the Thirteenth Amendment, the Act implements a policy of the highest priority—the replacement of ghettos with truly integrated living patterns. *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972). As the Supreme Court has noted, " . . . when racial discrimination herds men into ghettos and makes

their ability to buy property turn on the color of their skin, then it too is a relic of slavery." *Jones v. Mayer Co.*, 392 U.S. 409, 442–443, 88 S.Ct. 2186, 2205, 20 L.Ed.2d 1189 (1968).

Like Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Fair Housing Act was enacted to ensure the removal of artificial, arbitrary, and unnecessary barriers when the barriers operate invidiously to discriminate on the basis of impermissible characteristics. *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Congress designed it to prohibit "all forms of discrimination, sophisticated as well as simpleminded." *Williams v. Matthews Co.*, 499 F.2d 819, 826 (8th Cir. 1974). The Act, therefore, is to be construed generously to ensure the prompt and effective elimination of all traces of discrimination within the housing field. *Trafficante v. Metropolitan Life Ins. Co.*, *supra* 409 U.S. at 211–212, 93 S.Ct. at 367–368; *see also Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Marr v. Rife*, 503 F.2d 735 (6th Cir. 1974).

Section 804(a) of the Fair Housing Act prohibits all practices which make unavailable or deny housing to persons because of race, color, religion, sex or national origin. This broadly drafted section reaches every practice which has the effect of making housing more difficult to obtain on prohibited grounds. *United States v. City of Parma*, 1 EOHC § 13,616 (N.D.Ohio 1973); *United States v. Youritan Constr. Corp.*, 370 F.Supp. 643 (N.D.Calif.1973), *aff'd in relevant part*, 509 F.2d 623 (9th Cir. 1975); *Zuch v. Hussey*, 394 F.Supp. 1028 (E.D. Mich.1975), *aff'd in relevant part*, 547 F.2d 1168 (6th Cir. 1977) (racial steering); *Laufman v. Oakley Bldg. & Loan Co.*, 408 F.Supp. 489 (S.D.Ohio 1976) (mortgage redlining); *Dunn v. Midwestern Indemnity Co.*, 472 F.Supp. 1106 (S.D.Ohio 1979) (insurance red-lining); *United States v. American In-stitute of Real Estate Appraisers*, 442 F.Supp. 1072 (N.D.Ill.1977), *appeal dismissed*, 590 F.2d 242 (7th Cir. 1978) (discriminatory practices of appraisers). Even the discretion normally accorded to local zoning officials, *see Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), is to be curbed where "the clear result of such discretion is the separation of low-income Blacks from all White neighborhoods." *Banks v. Perk*, 341 F.Supp. 1175, 1180 (N.D.Ohio 1972), *aff'd in part and rev'd in part without opinion*, 473 F.2d 910 (6th Cir. 1973). Thus, municipal land use practices which make housing unavailable on a prohibited basis violate the Fair Housing Act. *United States v. City of Parma, supra; Accord, e. g., Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (*Arlington Heights II*); *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3rd Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *United States v. City of Black Jack, supra.*

Violations of the Fair Housing Act can be established under two different theories. First, policies and practices which are motivated by racial discrimination violate the Act. *See, e. g., United States v. West Peachtree Tenth Corp.*, 437 F.2d 221 (5th Cir. 1971); *United States v. Northside Realty Associates*, 474 F.2d 1164 (5th Cir. 1973), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1483, 47 L.Ed.2d 747 (1976). Second, policies and practices may violate the Act if there is a showing of a racially discriminatory effect, even absent evidence of a racially discriminatory motive. *United States v. City of Parma*, 471 F.Supp. 453 (N.D.Ohio 1979); *Arlington Heights II, supra; Resident Advisory Board v. Rizzo, supra; United States v. City of Black Jack, supra; Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir. 1979); *Bishop v. Pecsok*, 431 F.Supp. 34 (N.D.Ohio 1976).

Standards covering the scope and nature of the evidence needed to prove a

violation under the first theory—racially discriminatory intent—have evolved not only in Fair Housing Act litigation, but also in cases involving alleged violations of the Equal Protection Clause. *See, e. g., Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (*Arlington Heights I*); *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). It is clear that the determination of "whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights I, supra* 429 U.S. at 266, 97 S.Ct. at 564. To find racial intent, a court must evaluate evidence derived from consideration of numerous factors, including: (1) the discriminatory impact of the policy or practice; (2) the historical backgrounds; (3) the "sequence of events leading up to the challenged decisions"; (4) departures from "normal procedural sequences"; (5) departures from normal substantive criteria; and (6) legislative or administrative history of the challenged decisions. *Id.* at 265, 97 S.Ct. at 563; *Resident Advisory Board v. Rizzo, supra* at 143. In addition, a court can consider whether a defendant adhered to a policy with full knowledge of its predictable segregative effects. *Columbus Board of Education v. Penick, supra* 99 S.Ct. at 2950; *see Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 2978 n.9, 61 L.Ed.2d 720 (1979); *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 2296 n.25, 60 L.Ed.2d 870 (1979).

■ Obviously, very persuasive evidence of racial intent can be found in the statements by decision-makers or their agents attesting to a policy of discrimination. *See, e. g., Arlington Heights I, supra* 429 U.S. at 268, 97 S.Ct. at 565; *Resident Advisory Board v. Rizzo, supra* at 144; *United States v. Reddoch*, 1 EOHC § 113,569 (S.D.Ala. 1972), *aff'd*, 467 F.2d 897 (5th Cir. 1972). But a finding of intent cannot be limited to

instances where decision-makers articulate overtly bigoted opinions. Such would reward subtlety and camouflage at the expense of uncovering the underlying motivation. Even though the overt public expression of bigotry has become unfashionable, *see Arlington Heights II, supra* at 1289–1290, racial intent still can be shown by a series of decisions *all* of which have had a segregative effect and result in a cumulation of disadvantage inexplicable on grounds other than an invidious but unstated basis. *See Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

■ To prove a violation of the Fair Housing Act under the "intent" standard which has emerged, it is not necessary that race be the sole or dominant motive behind the formulation and maintenance of policies and resulting actions. *See Arlington Heights I, supra.* The Fair Housing Act is violated if race was one of the motivating factors behind challenged conduct. *Robinson v. 12 Lofts Realty, Inc., supra* at 1042; *United States v. Pelzer Realty Co.*, 484 F.2d 438, 443 (5th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). *Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344, 349–350 (7th Cir. 1971). The rationale for not permitting race to be a "secondary" motivation has special force in the public sector. Political decisions inevitably involve the consideration and balancing of numerous competing interests. Indeed, it is the pyramiding of interests which often permits the forging of consensus. Many decisions would not be made, and actions not undertaken, if a particular motivation were absent. Permitting racial discrimination to be a "secondary" motivation would significantly raise the likelihood that decisions would be reached and actions undertaken on an impermissible basis.

Violations of the Fair Housing Act also can be established under the second theory of racially discriminatory effect. There is nothing in the language of Section 804(a), which prohibits any practice that makes unavailable or denies a dwelling to any person because of race, that requires proof

of intent. The "because of race" terminology of Section 804(a) is analogous to that used in Section 703(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) (Title VII), which prohibits employment practices which have discriminatory effects. *See Griggs v. Duke Power Co., supra; cf. Board of Education of New York v. Harris*, 444 U.S. 130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979) (effects standard applied under Emergency School Aid Act, 20 U.S.C. § 1601 *et seq.*). The practical effect of decisions and actions constitutes an appropriate standard under the Fair Housing Act because "the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme". *Hobson v. Hansen*, 269 F.Supp. 401, 497 (D.D.C.1967), *aff'd sub nom. Smuck v. Hobson*, 408 F.2d 175 (D.C.Cir.1969) (*en banc*).

Congress employed broad language in Section 804(a) of the Fair Housing Act in order to ensure that the Act's purpose of providing for fair housing throughout the country would be achieved. To sanction conduct which perpetuates and reinforces discrimination in the housing market, absent some convincing justification, would nullify the congressional goal and thwart the strong national commitment to integrated housing.

Courts which have considered the "racially discriminatory effects" standard under the Fair Housing Act have not been uniform in defining what proof is required to establish a violation. *Compare Arlington Heights II, supra, with Resident Advisory Board v. Rizzo, supra.* Certainly a *prima facie* case requires proof that challenged policies and actions have a discriminatory effect. However, that alone may not always be sufficient to prove a violation. *See Arlington Heights II, supra* at 1290. A court must be sensitive to at least four other "crucial" factors: 1) the strength of the showing of discriminatory effect; 2) evidence of discriminatory intent; 3) the defendant's interest in taking action complained of; and 4) the nature of the remedy sought. *Id.* To rebut the *prima facie* case of segregative effect, the defendant must prove that its conduct is justified in theory and practice by a legitimate bona fide interest. Also, "the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Resident Advisory Board v. Rizzo, supra* at 149.

The government asserts that Parma has violated Sections 804(a) and 817 of the Fair Housing Act under both the "intent" standard and the "effects" standard. Because the government contends that Parma has adhered to a general policy of racial discrimination, the Court must consider the evidence as a whole, as well as in its component parts. The character and effect of a general policy is to be judged in its entirety, and not by dismembering it as if it consisted of unrelated parts. *See Continental Ore Co. v. Union Carbide & Carbon Co.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1964); *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Davis v. School District of Pontiac*, 443 F.2d 573, 576 (6th Cir. 1971), *cert. denied*, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); *Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671 (6th Cir. 1979). Even intrinsically lawful acts may lose that character when they are constituent elements of an unlawful scheme. *Continental Ore Co. v. Union Carbide & Carbon Co., supra* 370 U.S. at 707, 82 S.Ct. at 1414.

## II. RACIAL HOUSING SEGREGATION IN THE CLEVELAND METROPOLITAN AREA AND PARMA

An extreme condition of racial segregation exists in the Cleveland metropolitan area. *See, e. g.*, this Court's earlier findings in *Mahaley v. Cuyahoga Metropolitan Housing Authority*, 355 F.Supp. 1257, 1259–60 (N.D.Ohio 1973), *rev'd on other grounds*, 500 F.2d 1087 (6th Cir. 1974), *cert. denied*, 419 U.S. 1108, 95 S.Ct. 781, 42 L.Ed.2d 805 (1974), and *Banks v. Perk*, 341 F.Supp. 1175, 1178 (N.D.Ohio 1972), *aff'd in part, rev'd in part on other grounds*, 473 F.2d 910 (6th Cir. 1973). As this Court has found previ-

ously, "Cuyahoga County has the racial shape of a donut, with the Negroes in the hole and with mostly Whites occupying the ring." *Mahaley, supra* at 1260. The "hole" referred to is the City of Cleveland; the ring is the surrounding suburbs. According to the 1970 census, 2,064,194 persons lived in the Cleveland Standard Metropolitan Statistical Area, ("SMSA") of whom 332,614 were black (Gov. Ex. 7). The City of Cleveland itself had 750,903 residents, of whom 287,841 were black (*id.*). Thus, almost 90% of the blacks in the metropolitan area lived inside of Cleveland.

These blacks residing within Cleveland were not dispersed generally. Rather they were concentrated on the east side of Cleveland (i. e. the area east of the Cuyahoga River) (Tr. 405). The relatively small number of blacks who had moved to the suburbs were themselves concentrated in two of the eastern suburbs.[1] The western suburbs were almost entirely white.[2]

An examination of 1970 census tracts also highlights the extreme degree of racial segregation in the Cleveland area. Blacks accounted for 16.1% of the Cleveland SMSA population (332,614 of 2,064,194). However, of the 440 census tracts in the Cleveland SMSA, 61 were over 80% black and 313 were over 95% white (Gov. Ex. 29). The predominantly black census tracts are all located on the east side of Cleveland (*see* census tract map in Gov. Ex. 107).

1. In 1970, East Cleveland had a population of 39,600, of which 23,196 were black (Gov. Ex. 8). The black population of this one suburb represented over half of the total number of blacks living in all of Cleveland's suburbs.

2. This pattern is summarized in the following table for areas in Cuyahoga County with more than 25,000 persons in 1970 (Gov. Ex. 29E) (and with the figure "a" in the table representing a percentage of black population less than 0.1%):

| Area | Percent Black in 1970 |
|---|---|
| City of Cleveland | |
| District I (East Side) | 10.9% |
| District II " " | 78.4% |
| District III " " | 54.2 |
| District IV (West Side) | 1.4 |
| District V " " | .2 |
| District VI " " | 2.7 |

There is no post-1970 census data yet available, but the experts who testified at trial agree that this pattern of racial segregation has not changed substantially. Blacks continue to be concentrated primarily on the east side of Cleveland. While there has been an increased migration of blacks into some of the eastern suburbs, there has been little movement of blacks to the west side of Cleveland and almost none to the western suburbs (Tr. 153, 927).

Parma is the largest of Cleveland's suburbs and is located to the south of Cleveland's west side. It is a heavily working-class community with 37.6% of its employed residents being blue collar workers (*see* table 1 in Gov. Ex. 107). Parma's median family income and residential home value are slightly above the average for the Greater Cleveland area (*id.*). About 19% of Parma's residents live in apartments (Gov. Ex. 25).

Parma is also virtually all-white. In 1970, Parma had 100,216 residents, of whom only 50 were black (Gov. Ex. 7). Throughout its development and growth, very few blacks have lived in Parma, as is shown in the following table (Gov. Ex. 3, 4, 5, 6 and 7):

| Year | Population of Parma | Number of Black Residents |
|---|---|---|
| 1930 | 13,890 | 4 |
| 1940 | 16,365 | 2 |
| 1950 | 28,897 | 17 |
| 1960 | 82,845 | 132 |
| 1970 | 100,216 | 50 |

| Area | Percent Black in 1970 |
|---|---|
| Eastern suburbs: | |
| Cleveland Hts. | 2.5 |
| East Cleveland | 58.6 |
| Euclid | .4 |
| Garfield Hts. | 4.3 |
| Maple Hts. | 2.0 |
| Shaker Hts. | 14.4 |
| South Euclid | .1 |
| Western suburbs: | |
| Brook Park | .3 |
| Lakewood | a |
| North Olmstead | a |
| Parma | a |
| Parma Hts. | a |

A map showing the locations of these areas (Gov. Ex. 29E) is attached as Appendix I.

This has occurred even though there was a pronounced increase in the numbers of blacks living in the Cleveland metropolitan area between 1930 and 1970.

As the preceding table indicates, Parma developed basically after the Second World War with its population more than tripling between 1950 and 1970. After World War II, many people who had lived in both the east and west sides of Cleveland moved to Parma and other Cleveland suburbs (Tr. 158, 711, 952). They took advantage of the low down-payment and mortgage policies of the Veterans Administration (VA) and the Federal Housing Administration (FHA) (Tr. 950–952), and found jobs as many employers left Cleveland for Parma and other suburbs (Gov. Ex. 23; Tr. 946–948). Although the growth of Parma has slowed in recent years, people continue to move there from the east and west sides of Cleveland (Gov. Ex. 28).

There is no accurate data available on the present racial composition of Parma. The Mayor of Parma, John Petruska, testified that he believed that Parma's total population has increased since 1970, and that there are now over 100 black families living in Parma (Tr. 1361). The Mayor's estimate of the number of black families may be exaggerated as there are only 36 black students in the Parma School District (Gov. Ex. 2), which includes the cities of Parma, Parma Heights and Seven Hills (Tr. 92). However, even if the Mayor's estimate is correct, the black population in Parma would still be well below 1%. Significantly, there are many more blacks who work in the Parma area than who live there. In 1977, large employers in the Parma area filing reports with the Equal Employment Opportunity Commission employed 1323 blacks, which was 6.3% of their total employment (Gov. Ex. 27).

Throughout this litigation, Parma's principal contention has been that the racial segregation in the Cleveland metropolitan area generally and in Parma specifically is not a result of racial discrimination. Parma claims that the housing segregation is a natural phenomenon caused by economics and by the free residential choice of blacks and whites to live with people of common backgrounds (ethnicity). For these reasons, Parma asserts that blacks do not want to live in Parma or indeed anywhere west of the Cuyahoga River, and, therefore, that none of Parma's actions could possibly have had the effect of excluding blacks.

The proposition that the Cleveland metropolitan area and Parma became racially segregated solely as a result of associational preferences and economics, and not because of racial discrimination, is refuted overwhelmingly by the evidence in this case. The proposition is also contrary to notorious and judicially-noticed facts about discrimination in the private and public housing markets.

### A. The Dual Housing Market

The black ghetto on the east side of Cleveland was created and has been maintained by a series of systemic and pervasive practices of private and public discrimination. Recounting this history does not make pleasant reading, and a brief summary will suffice.

Racial segregation in the Cleveland area did not begin until the turn of this century (Tr. 151–153). In the late 1800's small black "settlements" had developed in the east and west sides of the city, and in the western suburbs as well (Tr. 910–911, 928–930). As blacks began to move to Cleveland in greater numbers in the early 1900's, a shortage of housing developed, and they were confined to an area on the east side called the "Roaring Third," or "Darkie Town." (Tr. 151–153). This area continued to expand as more blacks moved to Cleveland. The small west side enclaves, however, did not expand because additional blacks were not allowed to reside there (Tr. 931–932). In certain areas, blacks were not even allowed to walk (Tr. 151–153).

Following the Second World War, blacks moved to Cleveland in huge numbers, and the black population grew from over 80,000 in 1940 to over 280,000 by 1970 (Gov. Ex. 4,

7). They settled on the east side of Cleveland, while hundreds of thousands of whites moved out, and settled in the suburbs. Blacks settled on the east side because they had no choice; other areas of the city and the suburbs were off-limits.

Blacks were confined to the east side by a confluence of pervasive acts of public and private discrimination, the most significant of which are discussed below:

1. Until 1950, the consistent policy of the FHA and VA was to prevent blacks from buying homes in white neighborhoods (Gov. Ex. 9, pp. 43–47; Tr. 765, 938).[3] For example, the FHA Underwriting Manual stated that "the infiltration of inharmonious racial and nationality groups" was "adverse" to neighborhood stability.[4] Underwriting agents were warned to deny insurance to "incompatible social and racial groups" because "change in the social and racial occupancy generally contributed to instability and a decline in values."[5] The agencies strongly encouraged private racially restrictive covenants to maintain the racial homogeneity of neighborhoods.[6] And, to assure "sound business principles," blacks were not allowed to participate in many aspects of the agencies' single-family housing programs.[7] The agencies also "generally withheld insurance from existing housing in central city areas" because those areas "occupied largely by minority groups had an unfavorable economic future".[8] "For a period approaching 20 years, the Federal government, through the FHA was the leading exponent of racial discrimination in housing and residential segregation." *Reed v. Rhodes*, 422 F.Supp. 708, 789 (N.D.Ohio 1976), *aff'd*, 607 F.2d 714 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980).

2. Following the FHA lead, racially restrictive covenants developed in the Cleveland area (Tr. 938). Although judicially unenforceable after 1948, they continued to be "viewed as a cloud on the title and excepted by title companies in their policies, at least until 1969." *Reed v. Rhodes, supra* at 789.

3. Yielding to public opposition, the Cuyahoga Metropolitan Housing Authority discriminated in its site and tenant selection practices and contributed to residential segregation in the Cleveland area. *Banks v. Perk, supra.*

4. Developers of federally subsidized housing generally were prevented from building (except in Cleveland's east side) because of opposition based on fears that this would bring blacks into white neighborhoods (Tr. 782–784, 790–794, 805).

5. Many real estate brokers dealing with housing in white areas refused to accept prospective black buyers (Tr. 259–260, 695–696). Indeed, until 1950, the Code of Ethics of the National Association of Real Estate Brokers stated: "A Realtor should never be instrumental in introducing into a neighborhood a character of property or occupancy, members of any race or nationality, or any

---

3. This Court and other courts have made findings concerning the federal agencies' discriminatory practices. *See e. g., Reed v. Rhodes*, 422 F.Supp. 708, 788–789 (N.D.Ohio 1976), *aff'd*, 607 F.2d 714 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). *Evans v. Buchanan*, 393 F.Supp. 428, 434–435 (D.Del.1975) (three-judge court); *Oliver v. Kalamazoo Bd. of Educ.*, 368 F.Supp. 143, 182–184 (W.D.Mich.1973), *aff'd*, 508 F.2d 178 (6th Cir. 1974).

4. *FHA Underwriting Manual* § 310 (1938), quoted in C. Abrams, *Forbidden Neighbors* 230 (1955).

5. *FHA Underwriting Manual* § 233 (1936) and § 937 (1938), quoted in C. Abrams, *supra* at 231.

6. *FHA Underwriting Manual* § 930(3)(g) (1938), quoted in *U.S. Comm'n on Civil Rights, Federal Policy and Equal Housing Opportunity* 734 (1971).

7. *See, e. g.,* M. Gelfand, *Nation of Cities* 220 (1977).

8. Statement of HUD Secretary George Romney in *Equal Educational Opportunity: Hearings Before the Senate Select Comm. on Equal Educational Opportunity*, 91st Cong. 2d Sess. 2353, 2755 (1970).

individuals whose presence will clearly be detrimental to property values in that neighborhood." [9]

6. Banks, savings and loans, and insurance companies "red-lined" black and integrated neighborhoods, a practice which has not ceased in Cleveland (Tr. 158–159, 264, 700, 938–940, 948–949, 973–974; Gov. Ex. 9, pp. 25–26). And, until enjoined in 1977,[10] the American Institute of Real Estate Appraisers warned against the adverse effects of the "infiltration of inharmonious racial groups" because home values "change when people who are different from those presently occupying an area advance into and infiltrate a neighborhood" and "problems associated with minority group segments of the population can hinder community growth." [11]

7. Beginning in the mid-1950's, there was an increase in the employment of blacks in the west side and in the western suburbs. Many of these people wanted to live close to their work (Tr. 268; see also Gov. Ex. 27). However, most were unable to find homes because of private refusals to sell and because of the inability of east side brokers to get listings in the west (Tr. 259–260, 264, 266, 268).

8. There has been, and to a large extent there still is, a dual market in the real estate business. Black realtors were denied membership on the real estate board (Tr. 267), access to multiple listing services (Tr. 729, 941–942), and cooperation with white realtors (Tr. 695–696). As a consequence, black brokers lacked knowledge of listings in the west side of the Cleveland metropolitan area and could not show black clients housing prospects there (Tr. 703). Furthermore, racial steering by brokers had been, and continues to be prevalent (Tr. 942).

9. In Parma and other western suburbs, white and black brokers were unable to find housing for black clients. When these brokers were able to discover listings, homeowners either refused to deal with them (Tr. 253–260) or refused to sell to their black clients (Tr. 259–264, 349–350). In Parma, as in other areas, there were rock-throwing incidents when a white family placed its home on the open market (Tr. 350). Other instances of hostility and physical abuse marked the reaction of residents of white areas when it was thought a black might move in (Tr. 349–352, 769–770, 943).

## B. "Associational Preference" Hypothesis

In the face of overwhelming evidence of racial discrimination, Parma insists that the extreme racial segregation which exists in the Cleveland area actually is caused by the free associational preferences of whites and blacks. Under this theory, ethnicity [12] rather than race is considered to be the principal motivating factor influencing decisions on residential location. Parma's contention is that racial segregation is nothing more than a manifestation of a broader ethnic segregation.

The underpinnings of this hypothesis are rooted in historical immigration and settle-

**9.** National Ass'n of Real Estate Brokers, *Code of Ethics* (Art. 34, Pt. III), cited in R. Helper, *Racial Policies and Practices of Real Estate Brokers* 201 (1969).

**10.** *See United States v. American Inst. of Real Estate Appraisers*, 442 F.Supp. 1072 (N.D.Ill. 1977).

**11.** These portions of AIREA's text and basic manuals are quoted in Bradford, *An Analysis of Underwriting and Appraisal Practices and Their Impact on Credit Availability*, 3 *Real Est. Issues* 1, 4–5 (1978). Whites living in or near areas of minority concentration in Cleveland also could not get loans because of red-lining (Tr. 973–974) and this accelerated the movement of whites to the suburbs (Tr. 158–159).

**12.** Dr. Bonutti, Parma's expert witness, defined an ethnic as any person who feels part of a subcultural group emphasizing a language, religious, and cultural difference from those of the main culture of the United States (Tr. 874). Dr. Bonutti contends that "almost everybody in the United States is an ethnic". (Tr. 875). Dr. Bonutti's definition of "ethnicity" is certainly not a model of clarity. He claims that ethnicity is a subconscious state apparently transmitted by parents, which remains with the individual even when expressly rejected. It is "the element which creates our own or enforces the type of personality we have, the type of relationship we lay [sic] with others." (Tr. 875).

ment patterns. During the 19th century and continuing until 1924, white ethnic groups immigrated to Cleveland (Tr. 880–883). Being poor immigrants, they grouped together in various ethnic enclaves in Cleveland's poorest neighborhoods (Tr. 884–890). Hostility existed between the various ethnic groups, especially between the old established groups and the newly arrived ones (Tr. 140–142).

As its economic condition improved, each ethnic group moved out of the poorer ethnic enclaves and into the suburbs (Tr. 890–891, 901–907). Blacks began to settle in Cleveland after World War II in poor sections on the east side vacated by earlier ethnic immigrants (Tr. 883, 893–894). The economic condition of Cleveland's blacks has improved only recently, and blacks have now begun to move out to the eastern suburbs.

Parma's basic explanation for this migrational pattern depends on the concept of an "ethnic corridor", by which identifiable ethnic groups engage in unidirectional movement from the City to the suburbs, following established traffic arteries or roadways (Tr. 908). Development of these corridors is frustrated by natural barriers such as lakes and rivers, and man-made barriers such as industrial parks and freeways (Tr. 907–909). Utilizing the "corridor" concept, Parma argues that the black settlement and migration in the Cleveland area merely follows the same basic pattern that characterized the migration of other ethnic groups: from a heavy concentration in the inner city to the suburbs via the corridor (Tr. 901–904). Like whites, blacks prefer to be in the neighborhood of the same ethnic background (Tr. 915). The black corridor moves from the east side of Cleveland into East Cleveland, and is now moving towards other eastern suburbs such as Maple Heights and Bedford Heights (Tr. 890–893). Dr. Bonutti, Parma's expert, does not foresee any significant movement of blacks to the west side or to any of the western suburbs (Tr. 914–915) because the Cuyahoga River acts as a barrier to migration (Tr. 907).

The Court finds Parma's "associational preference" hypothesis, with the ac-companying "corridor" theory, to be seriously flawed both in terms of logical inference and empirical validity. Perhaps most significantly, it is impossible to attribute racial segregation to the free associational choice of blacks when free choice has never existed. Dr. Bonutti admitted the existence of discrimination against blacks in the housing market and asserted that this simply reflected traditional hostility experienced by ethnic groups settling in a new area. At one point, Dr. Bonutti testified, "there is no question that there is a lot of discrimination. And it's not only discrimination against blacks. It's discrimination that is applicable to all groups that came here." (Tr. 932). Parma's expert further acknowledged the continued existence of many of the discriminatory practices in the housing market (Tr. 938–949; see pp. 1057–1059, supra), and admitted that this discrimination is a factor which influences existing residential patterns (Tr. 945–946). To suggest that associational preferences, rather than these practices of discrimination, are the major causes of segregation would not only be contrary to the evidence, but would also place this Court in conflict with the judgment of the State of Ohio (Gov. Ex. 9, p. 48), the judgment of Congress when it passed the Fair Housing Act, see e. g., 114 Cong.Rec. 2278 (1968) (statement of Senator Mondale); id. at 9563 (statement of Representative Celler), and the judgment of the Executive branch, see, e. g., Evans v. Buchanan, supra at 434 n.10 (citing statement of President Nixon).

While the evidence of housing discrimination against blacks is overwhelming, Parma suggests that this is a "natural" phenomenon because discrimination in housing also confronted earlier ethnic groups when they settled in the Cleveland area. This argument makes the erroneous assumption that ethnicity is equivalent to race. Nowhere is this supported in the record. Indeed, the attempt to categorize race as a subset of ethnicity ignores the one crucial characteristic that distinguishes blacks from white ethnics: color. In addition, the argument that discrimination is "natural" merely

means that it has existed in the past. But neither the present nor the future can be burdened by prior injustices based on racial or national bigotry.

The "associational preference" by hypothesis also fails because it is simply not plausible to believe that the supposed preference of blacks to live in black neighborhoods would subordinate people's desire to lead better lives. Dr. Bonutti admitted that blacks have the same aspirations as anyone else (Tr. 969). He also conceded that employment and housing conditions are much worse in the black east side ghetto than in the western suburbs (Tr. 946–950). And, as Dr. Campbell, the government's expert stated, and as the Court is well aware, there are areas in the ghetto which look like bombed-out cities (Tr. 219–220).

Parma would have this Court believe that blacks prefer the life of the ghetto with its attendant filth, degradation, and crime to the life of suburbia because they do not wish to live in white or integrated neighborhoods. For substantiation, the City relies on testimony from Dr. Bonutti that is based on two studies, neither of which is of probative value.[13] The Court finds no evidence to support Parma's contention that blacks freely choose to reside in the ghetto solely in order to reside with fellow blacks.[14] The record clearly refutes such a position (e. g. Tr. 221, 703–705). Furthermore, the contention posits a degrading racial hypothesis which this Court does not believe and will not make.

Parma's "ethnic corridor" theory also does not explain why blacks only recently

began moving to some of the eastern suburbs and have not even begun to move to the western suburbs. The explanation provided is that the "corridors" take time to develop, and are dependent on the improvement of economic conditions of the ethnic group. Blacks, who settled in Cleveland after white ethnic groups and who are relatively disadvantaged economically, are therefore last in time and money when it comes to the development of a corridor. Additionally, it is argued that a corridor will not develop unless the group is sizable.[15]

However, at least two of the factors believed to contribute to the development of a corridor—size and time—have existed for many decades with respect to blacks. There were almost 35,000 blacks living in Cleveland in 1920 (Gov. Ex. 3) and over 85,000 blacks living in Cleveland before World War II (Gov. Ex. 4). If Parma's "corridor" theory were true, many of these early black settlers, their children and grandchildren would have moved to the suburbs, but as Dr. Bonutti admitted, they have not (Tr. 925).[16]

Parma offers no convincing explanation as to why no black "corridors" have developed, or will develop, in the direction of the western suburbs. Dr. Bonutti claims that geographic barriers—the Cuyahoga River, freeways, industrial sites—inhibit the development of such corridors (Tr. 907). But while there is no question that geography influences residential development, the record is replete with evidence of white ethnic groups which have jumped spatially or have

---

13. Dr. Bonutti erroneously attempts to rely on a study by Father Navins. However, that study does not deal with the issue of whether blacks desire to move out of their neighborhoods (Tr. 945, 975). He also relies on a simple quote concerning a poll discussed in a study by Edward Banfield which does not deal with Cleveland (Tr. 975).

14. There is some evidence indicating that blacks are fearful of moving to the white suburbs because of hostility on the part of some whites (Tr. 227). This is merely another manifestation of the discriminatory environment

which has confronted blacks in the Cleveland area.

15. Dr. Bonutti is unable to give a precise figure regarding the size that would enable a corridor to form. The minimal number appears to be ten thousand (Tr. 901).

16. There are many fourth and fifth generation blacks in Cleveland, but few have moved to the suburbs. This is unlike the Appalacians who settled in Cleveland after the post-World War Two influx of blacks, but who have moved to the suburbs to a much greater extent (Tr. 201).

dispersed when confronted with barriers to expansion (Tr. 958–965). No reason is proffered why this did not occur with blacks.

Not only did a corridor not develop from Cleveland's east side to the west, but black enclaves in the west side did not expand either. In the late 1800's, several black neighborhoods had developed on Cleveland's west side and in the western suburbs (Tr. 928–930). Unlike white ethnic enclaves nearby, they never developed "corridors" to places like Parma (*id.; see also* Tr. 690–700). Parma claims that this occurred because the neighborhoods were "well-defined" (Tr. 929) and not very large. The reason for the lack of expansion of these well-defined, small neighborhoods becomes clear only when it is realized that blacks were not allowed to settle around them (Tr. 931–932). It is also clear from the record that there has been much greater resistance to black migration in the west than in the east (*e. g.,* Tr. 782–784, 260–264).

Finally, Parma's "ethnic corridor" theory is greatly exaggerated. It is true that ethnic groups lived in "urban villages" before World War II, partly because of choice and partly because of discrimination (Tr. 141–142). However, as the government's expert, Dr. Campbell, explained, every ethnic group except blacks is now dispersed throughout the Cleveland metropolitan area (Tr. 147, 148, 164–168; *see also* Gov. Ex. 114B, 120). If white "ethnic corridors" exist, they cannot readily be found. Dr. Bonutti admitted on cross-examination that each white ethnic group is dispersed throughout the suburbs (Tr. 958–966).[17] Heavy concentrations of individual white ethnic groups do not exist in either the City of Cleveland or in the suburbs (Tr. 956). In fact, there is only one census tract in the entire Cleveland area in which a single white ethnic group accounts for a majority

(Tr. 955). In Parma itself, there are substantial numbers of almost every ethnic group except blacks (Tr. 148). As Dr. Campbell stated, "[I]n all these urban villages or ghettos, if you want, there were entrances for all of the people but there were no exit signs for the blacks and no exits on the west side." (Tr. 221–222).[18]

Perhaps the most fundamental flaw in the "associational preference" theory, with its heavy reliance on the concept of "ethnicity", is the effort to assume that race is identical to ethnicity. The fact remains that blacks are distinguishable from other groups not on the basis of religion, language, or national origin, but rather on the basis of color. Parma's entire corridor theory assumes a monolithic ethnic black culture which in fact does not exist.

### C. *Parma's "Economics" Explanation*

Parma's other explanation for racial segregation is economics. However, a review of census data for the Cleveland Metropolitan area reveals that economics has little to do with racial segregation. In 1970, Shaker Heights, the wealthiest suburb in the Cleveland area (*see* table in Gov. Ex. 107), had a median family income of $19,918 and a median home value of $41,814 (*id.*). Parma, on the other hand, had a median family income of $12,425 and a median home value of $24,079 (*id.*). But Parma is virtually all-white, while Shaker Heights is one of the only integrated suburbs in the Cleveland area. In 1970, less than 0.1% of Parma's residents were black, compared to 14.5% in Shaker Heights (*id.*).

A more systematic examination of the relationship of economics and other factors to residential segregation in the Cleveland area was done by Dr. John Kain, an expert witness for the government. Dr. Kain's

17. Even Dr. Bonutti's own experience is contrary to his theory. He is of Slovenian ancestry and immigrated to the United States in 1950. (Tr. 858–860). He settled in an area of Slovenian concentration because he didn't speak English and had no friends in Cleveland. He now lives in Pepper Pike, an exclusive area outside of the Slovenian "corridor" (Tr. 921–924).

18. Former Cleveland Mayor Carl Stokes described the situation more colloquially: blacks have not crossed the Cuyahoga River—and "not because they couldn't swim." (Stokes dep. 75).

analysis builds upon the work of Dr. Karl Taueber. Using 1960 census data, Dr. Taueber had found that only a small fraction of the intense amount of racial segregation in the Cleveland area could be explained by the differences in income between blacks and whites (Tr. 379–381). Dr. Kain's study differs from Dr. Taueber's in that more recent census data (1970) is used and household characteristics (family type, age of household and family size) are considered as well as income (Tr. 384–385). Testing the theory that the socio-economic characteristics of the black population are capable of explaining the concentration of blacks within particular neighborhoods in the Cleveland area, Dr. Kain found that if residential location were based solely upon these socio-economic factors, substantial numbers of blacks would live everywhere in the Cleveland metropolitan area (Tr. 408; Gov. Ex. 29).

Dr. Kain found a dramatic difference between the actual racial distribution in the Cleveland area and the distribution that would have resulted from socio-economic factors. As noted earlier, 61 of the 440 census tracts in the Cleveland SMSA were over 80% black in 1970, and 313 census tracts were over 95% white (*see* p. 1056, *supra; see also* Tr. 408–409). However, if residential location were determined by income and household characteristics, no census tract would have been more than 60% black, only one tract would have been in the range 50–59% black, no tract would have been less than 5% black, and most census tracts would have been 10–20% black (Tr. 409; *see* Gov. Ex. 29C).

A comparison of the actual population of blacks in specific areas with the expected population in those areas if residential location were determined by income and household characteristics also was undertaken. The findings are summarized in the following table (Gov. Ex. 29F) ("a" means less than 0.1% blacks):

Actual and Predicted Percentage of Black Population in Selected Geographical Areas in Cleveland SMSA

| Area | Percent Negro Actual | Percent Negro Predicted |
|---|---|---|
| Brook Park | .3% | 13.3% |
| District I (Cleveland) | 10.9 | 16.7 |
| District II (Cleveland) | 78.4 | 31.2 |
| District III (Cleveland) | 54.2 | 20.8 |
| District IV (Cleveland) | 1.4 | 20.2 |
| District V (Cleveland) | .2 | 15.8 |
| District VI (Cleveland) | 2.7 | 14.3 |
| Cleveland Heights | 2.5 | 11.4 |
| East Cleveland | 58.6 | 19.3 |
| Euclid | .4 | 18.1 |
| Garfield Heights | 4.3 | 13.7 |
| Lakewood | a | 13.0 |
| Maple Heights | 2.0 | 13.6 |
| North Olmstead | a | 12.6 |
| Parma | a | 12.7 |
| Parma Heights | a | 12.1 |
| Shaker Heights | 14.4 | 8.5 |
| South Euclid | .1 | 11.2 |
| Balance of Cuyahoga | 2.6 | 14.9 |
| Mentor | .5 | 13.7 |
| Geauga County | 1.2 | 13.8 |
| Balance of Lake County | 1.6 | 14.0 |
| Medina County | .8 | 14.7 |

This table shows that if income and household characteristics determined residential location, the Cleveland metropolitan area would be racially integrated with a substantial representation of blacks in every suburb. Parma itself would have been 12.7% black in 1970, or three hundred and twenty times the actual percentage (.04%).

Using the same techniques to examine the relationship of income and household characteristics on the residential distribution of white ethnic groups yielded results quite different from those observed for blacks (Tr. 413). Foreign stock individuals[19] are dispersed widely throughout the Cleveland metropolitan area. Using his basic model ("Model I"), Dr. Kain found that, with one exception, the actual distribution

**19.** The census identifies "foreign stock" as people who are foreign born or who had a foreign born parent (Tr. 413).

of foreign stock persons was close to the distribution that would be expected based on income and household characteristics (Tr. 413–415). The one exception was the area on the east side of Cleveland where blacks are concentrated most heavily (*id.*). Dr. Kain, using an alternative model ("Model II") in which his calculations were limited only to the white population (Tr. 413–417), found that the match between the actual and predicted distributions of white ethnic groups was improved (Tr. 425). These results are summarized in the following table (Gov. Ex. 29F):

Actual and Predicted Percentage of Foreign Stock Population in Selected Geographical Areas in Cleveland SMSA

| | Percentage Foreign Stock | | |
| | | Predicted | |
| Area | Actual | Model I | Model II |
| Brook Park | 20.8% | 19.0% | 21.7% |
| District I (Cleveland) | 35.4 | 27.1 | 29.4 |
| District II (Cleveland) | 8.5 | 21.6 | 7.6 |
| District III (Cleveland) | 20.1 | 24.7 | 15.8 |
| District IV (Cleveland) | 27.8 | 24.0 | 29.2 |
| District V (Cleveland) | 37.5 | 27.0 | 31.6 |
| District VI (Cleveland) | 31.1 | 25.9 | 29.3 |
| Cleveland Heights | 36.7 | 28.8 | 31.6 |
| East Cleveland | 15.9 | 24.4 | 15.6 |
| Euclid | 33.1 | 27.2 | 30.9 |
| Garfield Heights | 35.9 | 26.7 | 29.6 |
| Lakewood | 28.3 | 27.9 | 31.8 |
| Maple Heights | 33.3 | 25.8 | 29.2 |
| North Olmstead | 24.0 | 22.6 | 25.8 |
| Parma | 36.1 | 25.7 | 29.3 |
| Parma Heights | 32.6 | 26.2 | 29.6 |
| Shaker Heights | 28.3 | 30.4 | 29.1 |
| South Euclid | 45.8 | 30.0 | 33.4 |
| Balance of Cuyahoga | 39.9 | 35.4 | 38.9 |
| Mentor | 14.4 | 22.8 | 26.1 |
| Geauga County | 20.4 | 21.7 | 24.7 |
| Balance of Lake County | 21.7 | 23.1 | 26.2 |
| Medina County | 12.8 | 22.9 | 26.5 |

Finally, Dr. Kain looked at Parma and compared the actual proportions of specific ethnic groups with the predicted proportions based on income and household characteristics. He found a very close relationship (Tr. 428–430):

Actual and Predicted Percentages of Specific Foreign Stock in Parma

| Group | Actual | Predicted |
| Polish | 5.4% | 4.4% |
| German | 3.8 | 2.7 |
| Czech | 5.6 | 4.2 |
| Austrian | 2.7 | 2.4 |
| Hungarian | 2.0 | 2.6 |
| Russian | 3.1 | 2.3 |
| Italian | 3.7 | 5.0 |
| Other | 7.7 | 10.8 |

From these analyses, Dr. Kain concluded that income and household characteristics substantially explained the residential distribution of white ethnic groups, but not of blacks. Thus, another factor has operated to confine blacks, but not white ethnic groups, in certain areas. Based upon his extensive knowledge of housing markets and urban development, Dr. Kain concluded that this factor is racial discrimination (Tr. 432; Gov. Ex. 29).

■ Parma's attempt to rebut Dr. Kain's analysis involved three criticisms of Dr. Kain's study: first, that a different mathematical model should have been used (Tr. 1021–1023); second, that important variables were omitted from, and should have been used in, the study (Tr. 1028–1043); and third, that statistical tests showed that no conclusions could be drawn from Dr. Kain's observed results (Tr. 1044–1068). The Court finds the criticisms to be largely without factual foundation.[20]

Dr. Ramsey, Parma's expert on econometric models, testified solely on the validity of Dr. Kain's models. However, the alternative mathematical model urged by Dr. Ramsey, to his knowledge, has never been used in any published works in the area of demographic patterns by race or ethnicity (Tr. 1076). In fact, Dr. Ramsey has never studied housing segregation, demographic patterns, or any other subject dealing with

---

**20.** The Court is well aware of the limitations inherent in statistical analysis. Areas of difficulty include a not totally satisfactory data base, somewhat pliable explanatory concepts (i. e. ethnicity), the multiplicity of factors which influence individual residential choices, and the inability conclusively to isolate controlling factors affecting choice. There is, however, no requirement that statistical evidence amount to proof to a mathematical certainty. While deficiencies may detract from the value of statistical evidence, the evidence may still be probative. *Detroit Police Ass'n v. Young*, 608 F.2d 671, 687 (6th Cir. 1979).

an aspect of racial discrimination (Tr. 1073). In any event, the invalidity of the central concept of Dr. Ramsey's model—clusterings due to ethnicity—has already been addressed (see pp. 1057–1062, supra). Dr. Kain's models substantially account for existing white ethnic clustering, but not for black residential patterns.

The important variables which Dr. Ramsey believes were erroneously omitted from Dr. Kain's study—wealth, religion, occupation, lifestyle (Tr. 1034)—were omitted either because the variables had not been employed and tested before, because the data did not exist (Tr. 1090–1091, 1099–1103), or because the variable is not truly significant (Tr. 1091–1098).

Finally, the statistical tests performed by Dr. Ramsey in an effort to discredit Dr. Kain's study were sometimes misleading or meaningless (Tr. 1105–1112). Some of the tests were performed erroneously (Tr. 1117–1124), and other tests were conducted without confirming necessary statistical assumptions (Tr. 1130–1132). Finally, some of Dr. Ramsey's statistical tests produced results consistent with Dr. Kain's conclusions (Tr. 1136–1144, 1125–1126).

Based on the record, the Court finds that the racial segregation in the Cleveland area cannot be attributed to either associational preferences or economics. The Court finds that a principal cause of the housing segregation is the past and present discrimination suffered by blacks.

## III. PARMA'S RACIALLY EXCLUSIONARY POLICIES AND PRACTICES

As a result of the long-standing practices of private and public discrimination described earlier, the western part of the Cleveland metropolitan area is considered by most black people as hostile territory and a place where blacks simply are not welcome (Tr. 210, 225–226, 268, 269, 344–345, 351, 702, 709–711; Stokes dep. 49–50). Parma shares this image of exclusion based on race; it has the reputation in the black community, among realtors and brokers generally, and with Parma residents of being a city reserved for whites and opposed to racial integration.[21] This is the undisputed testimony of Parma residents (Tr. 86, 109, 118–119), of former mayor of Cleveland, Carl Stokes (Stokes dep. 21, 47–48), of the present mayor of neighboring Parma Heights, Paul Cassidy (Tr. 1426–1428), of federal housing officials (Tr. 269), of experienced black and white real estate brokers (Tr. 710–711, 344–345), and of the government's expert, Dr. Campbell (Tr. 225–226).

Parma's exclusionary image differs in degree from other western suburbs. Parma is generally considered to be the suburb that is most hostile to blacks (Tr. 269, 345; Stokes dep. 48), and is a "symbol" of resistance to integration (Tr. 345).[22] According to a former Councilman-at-large of the City, "Parma has a national reputation as being a segregation community" (Sands dep. 28).

A city's reputation can be created and affected by the publicly-expressed attitudes of its leadership. Racial statements made by Parma's elected officials contributed to the perpetuation and intensification of this image of exclusion based on race (Tr. 269, 711; Stokes dep. 41–46). It takes little education or sensitivity to perceive the attitude reflected by City Council President Kuczma when he stated "I do not want Negroes in the City of Parma." (Gov. Ex. 118). His remarks were made at a public meeting and were publicized widely in the press and television. They served to reinforce Parma's reputation as a place that "did not want blacks to live there . . "

---

**21.** This Court is well aware that in many instances, reputations are not well deserved. But the existence of an image, even if unjustified by the underlying facts, is a relevant and important factor in explaining residential choice. Additionally, it forms part of the historical background against which evidence must be weighed.

**22.** The Court does not find, based on the present record, that Parma is in fact the western suburb most hostile to blacks. Any such finding would require a comparative analysis of the relevant suburbs.

(Stokes dep. 43–48; *see also* Tr. 711).[23] Also publicized and contributing to the exclusionary image was Parma Mayor John Petruska's assurance that the "entire east side of Cleveland" would not be moving into Parma (Gov. Ex. 119; Petruska dep. 108). The statement was made at a public meeting on a federally subsidized low-income housing proposal, and followed a discussion which touched on racial concerns (Petruska dep. 108). The suggestion that the remark was referring to general housing conditions as opposed to blacks is not credible.

Mayor Petruska's remarks were not limited to public meetings in Parma. His nationally televised statement that Parma was integrated when it had three black families (Gov. Ex. 30, p. 14) was widely known and is still remembered for the racial attitude it expressed.[24] As former Mayor Carl Stokes noted afterwards (Stokes dep. 44–45, 46):

> It was something that is tragic in its fact, in its being a fact, and yet a person literally saying out loud something that so unconsciously by itself reflects the actuality of the racial exclusion . . .
> There is nothing surprising to black Clevelanders about racism in Parma.

These statements by the Mayor and the City Council President contributed to the creation of Parma's image of racial exclusion. Parma's racially exclusionary image is a perpetuating cause of housing segregation. One of the factors that influences most people in considering where to live is whether they will be welcome (Tr. 701, 769–771). People desire to avoid hostile situations, and the perception that they are not wanted in a certain area is a real deterrent to their moving into the area (*id.*). Because Parma is viewed as a place where blacks are not welcome, blacks are prevented from moving there and the City's virtually all-white composition is maintained.

It is against this backdrop that the government's pattern and practice suit challenges five specific actions or series of actions taken by Parma:[25]

A) Parma's refusal to enact a fair housing resolution welcoming "all persons of goodwill";

B) Parma's general opposition to all forms of public and low-income housing;

C) Parma's denial of building permits for a privately-sponsored low-income housing development—Parmatown Woods;

D) Parma's enactment and application of four land use ordinances which impose height, parking and voter approval limitations on housing developments; and

E) Parma's refusal to submit an adequate housing assistance plan in connection with its application for Community Development Block Grant Funds

It is these actions, individually and collectively, which the government alleges violated the Fair Housing Act. The government contends that these actions denied rights to groups of people and amounted to a pattern and practice of resistance to the full enjoyment of rights granted by the Act.

---

**23.** Mr. Kuczma made no attempt to retract his statement (Kuczma dep. 132) and realized that it would have a lasting effect. He testified: "Even if the newspaper printed a retraction in bold one-inch letters across their next issue, the impact would be there" (*id.* at 109).

**24.** This attitude continues to be expressed by Mayor Petruska. At trial he insisted that Parma was integrated when it had three black families, because "the numbers don't count." (Tr. 1396–1397). In his deposition, Mayor Petruska felt unable to respond to the question of whether he favored racial integration in Parma (Petruska dep. 277–278). By the time of trial, he was able to modify but not clarify his response: "I have no problem with it." (Tr. 1394).

**25.** Another action challenged by the government took place shortly before the Fair Housing Act was passed and therefore cannot constitute an independent violation of the Fair Housing Act. *Cf. Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1979). It is discussed in Appendix II.

## A. REFUSAL TO ENACT THE FAIR HOUSING RESOLUTION

In the late 1960's, a number of communities in the Cleveland area considered proposals to demonstrate local support for the recently passed state and federal fair housing laws (Tr. 84, 1304). At least one local fair housing organization actively promoted the area-wide passage of fair housing resolutions by proposing specific language for adoption by the various government bodies (Tr. 1303; Sands dep. 45–46). A number of communities, including Parma's neighbor, Parma Heights, adopted such resolutions (Tr. 1416–1417). Some, including Parma, did not (Tr. 1304; Sands dep. 30–31; Gov. Ex. 31; Petruska dep. 36).

A proposed fair housing resolution was put before the Parma City Council in mid-1968 by John F. Sands, a Councilman-at-large and the Majority Leader. Part of its language stated simply that " . . . all persons of good will have been and are welcome in the city of Parma by this Council . . . " (Gov. Ex. 122; Sands dep. 33) [26] Mr. Sands actually was ashamed of proposing such a weak resolution (Sands dep. 37), but, although he wanted to use much stronger language, he was convinced that a strong proposal would have absolute-ly no chance of passage (*id.* at 37–39, 44). Accordingly, Sands offered a resolution which would have no legally binding effect. Instead of identifying which people were to be "welcome" in Parma (such as people of all races), the resolution simply welcomed all people of "goodwill." The proposal also contained language defending the right of Parma property owners to dispose of their property as they wished in order that the resolution would not appear to "enforce morality" (Gov. Ex. 122).

Despite the manifestly weak language of the proposed open housing resolution, it aroused tremendous controversy and opposition. Mr. Sands was deluged with about a hundred letters and telephone calls during the three-week period after he introduced it (Sands dep. 18–19). Most of those who contacted Mr. Sands were opposed to the resolution, and many said he should not even talk about open housing because there was no need for it (*id.* at 22–23). A significant number openly expressed opposition to integration (*id.* at 23). Mr. Sands described the intensity of opposition to his proposal as "unbelievable" (*id.* at 18–19).[27]

Mayor Petruska opposed the resolution publicly. In a meeting with clergy, Council members and Parma citizens concerning the proposal,[28] he noted that the problems of

---

26. The fair housing proposal in its entirety is as follows (Gov. Ex. 122):

WHEREAS, some of the residents of the city of Parma have requested the Parma City Council to pass a resolution concerning a position on Fair Housing; and

WHEREAS, there is a great general interest in the position of every city on Fair Housing.

WHEREAS, all persons of goodwill have been and are welcome as residents of the city of Parma.

WHEREAS, all property owners of the city of Parma shall and do have the right to control the sale of their property as they wish; and

WHEREAS, no municipal authority should enact any legislation or pass any resolution that would diminish the rights that a person acquires when he becomes a property owner. NOW, THEREFORE, BE IT RESOLVED BY THE COUNCIL OF THE CITY OF PARMA, COUNTY OF CUYAHOGA AND STATE OF OHIO:

That all persons of goodwill have been and are welcome in the city of Parma by this Council; and

That realizing this or any other resolution should not be used to enforce morality; this Council defends the individual property owners right to sell, lease, rent, control or dispose of their private homes and their right of association and the private enjoyment and use of their own homes.

27. Mr. Sands recalled only one other proposed legislation that evoked an equivalent reaction—a proposal relating to gun control (Sands dep. 24).

28. Mayor Petruska does not recall this meeting (Petruska dep. 33). The testimony of Mary Dunning on this point is discounted. She testified about a meeting in late 1967 or 1968 which discussed a fair housing resolution proposed by Operation Equality (Tr. 1293–1294). This is not the same as the resolution proposed by Mr. Sands in mid-1968 *see* Sands dep. 10).

the City of Cleveland should remain in Cleveland and Cleveland should deal with them; Parma would deal with Parma's problems (Tr. 89). During this litigation, however, Mayor Petruska changed his reason for opposing the resolution. At trial he testified that Parma was already bound by state fair housing laws which he was sworn to uphold, and therefore that the resolution was surplusage (Tr. 1322–1323).

On September 3, 1968, the Parma City Council rejected the proposed fair housing resolution by a vote of 7 to 5 (Gov. Ex. 31; Sands dep. 14). No evidence indicates that anyone voted against the resolution because it was too weak.[29] Those who voted against the resolution claimed that it was too specific in proscribing discrimination on account of race and religion, that it implied that Parma had discriminated in the past (Tr. 1306; Dunning dep. 198–199), and that it was simply unnecessary (Sands dep. 41; Tr. 1295).

However, the Court finds that the resolution was defeated, at least in part, because of opposition to racial integration. The resolution nowhere mentioned race or discrimination; nor could it have been understood as more than a good-will gesture. As Mr. Sands described the resolution, it was simply an "open declaration of an attitude" (Sands dep. 142).

The Court rejects Mayor Petruska's testimony that he opposed the resolution solely because state law, which he is sworn to uphold, already provided for fair housing (Tr. 1322–1323; Petruska dep. 33). Mayor Petruska, a lawyer, surely understood the difference between a resolution and a law. The fair housing resolution was not legally binding; rather, it simply espoused an attitude. Mayor Petruska's testimony also is refuted by his contemporaneous public statements, and by his later public comments on this subject. In late 1970 or early 1971, for example, Mayor Petruska addressed a meeting of the Parma Jaycees Wives (Tr. 101–103). At the meeting, a former president of that organization, who was a Parma resident for seven years, asked Mr. Petruska: "What about open housing in Parma?" (Tr. 103–104). The Mayor responded: "You don't have to worry about that. Our neighborhoods will stay the same" (Tr. 104). When the questioner then informed the Mayor that she supported open housing, the Mayor indicated that there already was open housing in Parma because three or four black families lived there (Tr. 104, 116).

The Court rejects Parma's contention that its refusal to enact the fair housing resolution had no segregative effect. Certainly passage of the resolution alone would not have insured that increasing numbers of blacks would choose Parma as the place to reside.[30] Unlike an ordinance, a resolution is intended to be symbolic; it is evidence of an attitude. As such, symbols do have meanings. By refusing to welcome "all persons of goodwill" as residents of Parma, the City sent out the message that black people of goodwill were not welcome. This contributed to Parma's image as a city that was reserved exclusively for whites (Stokes dep. 41–42).

## B. PARMA'S REJECTION OF PUBLIC AND LOW INCOME HOUSING

### 1. Conventional Public Housing

#### a. Public Housing Segregation in Cuyahoga County

With one minor exception, all of the conventional public housing in Cuyahoga County is administered by the Cuyahoga Metropolitan Housing Authority (CMHA) (Gov. Ex. 22, p. 1.). A vastly disproportionate

---

**29.** At trial, Parma asserted that the resolution might have been defeated because of language reaffirming the individual property owner's unfettered right to sell and rent property. The Court notes the self-serving nature of this asserted justification and finds no support for it in the record.

**30.** In 1968, the city of Parma Heights adopted a differently-worded Fair Housing Resolution which apparently has not appreciably altered the racial composition of that city (Tr. 1417).

number of public housing tenants are black. Although the Cleveland metropolitan area is only 16.1% black, almost two-thirds of the tenants in public housing are black (Gov. Ex. 11).[31] The waiting lists for public housing are even more heavily black; in 1979, for example, 78% of the families on the waiting lists (1437 of 1843) were black (Gov. Ex. 16).

Virtually all conventional public housing in Cuyahoga County has been built by CMHA inside of Cleveland (Tr. 627; *see* Gov. Ex. 107), and most of it is located in neighborhoods that are heavily black. In 1971, 20 of the 27 public housing projects were located on the east side of Cleveland in areas of heavy black concentration (Gov. Ex. 107). In 1978, this was true for 20 of 35 projects, and 5 of the 15 projects on the west side were in the few areas of heavy minority concentration (*id.*).

There is a huge shortage of public housing in Cuyahoga County. The total tenant population in public housing in 1973 was about 25,000 people (Gov. Ex. 20, p. 10). Another approximately 48,000 families are eligible for public housing in Cuyahoga County (Gov. Ex. 22). This severe shortage of public housing is directly attributable in part to the exclusion of public housing from the suburbs and its concentration in minority neighborhoods within Cleveland. There are two reasons why this situation developed.

First, within Cleveland itself, CMHA followed policies which had the effect of segregating public housing on the east side until this Court's 1972 decision in *Banks v. Perk*, 341 F.Supp. 1175 (N.D.Ohio 1972), *aff'd in part, rev'd in part on other grounds,*

473 F.2d 910 (6th Cir. 1973). Before the Stokes administration took office in the late 1960's, most of the public housing in Cleveland was in black neighborhoods on the east side. When Stokes tried to have projects constructed on the west side without a guarantee that blacks would be excluded (Stokes dep. 95), the Cleveland City Council opposed a cooperation agreement between the City and CMHA (*id.* at 82). The Council finally signed a cooperation agreement when HUD threatened to cut off federal funds (*id.* at 89). But once the guarantee of all-white public housing in white neighborhoods was removed, there was vehement opposition to public housing by west side residents (*id.* at 36). In 1971, a new city administration yielded to this public resistance and revoked building permits for new projects on the west side. *Banks v. Perk, supra* at 1178–1179. Finding that both the city and CMHA had violated the Constitution and the Fair Housing Act, this Court ordered the city to grant necessary building permits, and ordered CMHA to cease building projects in minority neighborhoods until public housing within Cleveland was desegregated. *Id.* at 1180, 1185–1186.

Following the order in *Banks v. Perk*, public housing segregation within Cleveland, although still pronounced, has lessened substantially. In the projects located in white neighborhoods on the west side, about 40% of the non-elderly occupants are black.[32]

A second reason for the substantial shortage of public housing in the Cleveland metropolitan area is that CMHA was prevented from building public housing in the suburbs.[33] To construct conventional public

---

31. The 1978 occupancy reports (Gov. Ex. 11) show that black families resided in 5,269 of the 7,903 units leased by CMHA (or 66%). In 1971, CMHA leased 8,768 units, of which 5,646 (or 64%) were occupied by blacks (Gov. Ex. 13).

32. Gov. Ex. 107 shows the location of all public housing projects. Five projects (Riverside Park, Crestview, Riverview, Lorain Square and West Boulevard Place) are in white neighborhoods. There are 1578 families living in these projects, of whom 486 are non-elderly (Gov.

Ex. 11). 197 of the 486 non-elderly families are black (40.5%), while 95 of the 1092 units for the elderly (8.7%) are occupied by blacks (*id.*).

33. One study has found that there are about 15,000 families living in the suburbs who are eligible for public housing (Gov. Ex. 22). Another approximately 8,900 families now residing in Cleveland, who are eligible for but do not live in public housing, desire to move to the suburbs (*id.*). Thus, the net suburban need for public housing amounts to about 24,000 families.

housing in any community, CMHA must first enter in a cooperation agreement with that community under which the Housing Authority will make payments in lieu of taxes and the community will give the Authority all services provided to all other residents (Tr. 627). The only suburbs which have signed cooperation agreements with CMHA are East Cleveland, Cleveland Heights and the Village of Oakwood (Tr. 627). All others, including Parma, have refused.

b. *Parma's Need for and Refusal to Allow Public Housing*

Like other suburbs of Cleveland, Parma has a genuine need for public housing. Well over 1,000 families living in Parma are eligible to live in public housing (Gov. Ex. 45; Petruska dep. Ex. 24, Table 15). According to one study, over 1300 families who reside in the City of Cleveland and are eligible for public housing have expressed an interest in moving to Parma (Gov. Ex. 22).

Officials of the City of Parma have long been aware of the need for public housing in their city. But instead of acknowledging the need for such housing, they have chosen to deny that the need exists and have ignored all invitations to participate in conventional public housing programs and other low-income housing programs.

In early 1969, the director of CMHA contacted public officials in Parma and advised them of various public housing opportunities that were available (Gov. Ex. 39). Parma officials were also sent a copy of CMHA's annual report for 1969 which advised them of the City's need for low-income housing and invited Parma's participation in CMHA's programs (Gov. Ex. 38). On July 25, 1969, the Chairman of CMHA sent a letter to all mayors in the Cleveland area inviting them to arrange discussions of CMHA's programs (Gov. Ex. 40). Mayor Petruska was among those who received the letter, but he did not respond to it (Tr. 627–629).

On March 18, 1971, Robert Fitzgerald, then director of CMHA, attended a meeting of the Cuyahoga County Mayors and City Managers' Executive Board at which Mayor Petruska was present. Fitzgerald addressed the group on the various programs offered by CMHA and explained that they could enter into a cooperation agreement with CMHA and make housing available to residents of their own area. Mayor Petruska expressed his desire that the suburbs have representation and input into CMHA decisions. After the meeting, however, no one from Parma contacted either CMHA or Fitzgerald (Tr. 640).

Although Mayor Petruska did not communicate with anyone at CMHA regarding the programs which had been discussed, he did not withhold his views from Parma officials or the public. Petruska made it clear that he had no interest in any form of public housing, and he expressly instructed the City Council not to enter into a cooperation agreement with CMHA (Tr. 1392). In an August 14, 1972 newspaper interview, Mayor Petruska responded to a report showing a need for public housing in Parma by stating that "Parma does not need and does not want" any low-income housing and vowing that he would fight any attempts by CMHA to build housing in Parma (Petruska dep. Ex. 17).

2. *Other Low Income Housing Programs*

In addition to conventional public housing, many other kinds of low-income housing have been available to Parma, but the City has consistently refused to participate in such housing. In 1972, for example, CMHA was following a policy of diffusing public housing through the home ownership, or "turnkey" program (Tr. 667). On March 10, 1972, CMHA's director wrote to all mayors of communities of Cuyahoga County, including Mayor Petruska, informing them of the turnkey program and asking for the opportunity to discuss it with them (Gov. Ex. 43). Mayor Petruska did not respond to CMHA's letter (Tr. 664). On June 19, 1972, Mayor Petruska was sent another letter by CMHA's director in which the turnkey program was explained in detail (Gov. Ex. 44), and again there was no response (Tr. 642).

The clear inference to be drawn from such conduct is that Mayor Petruska and the City of Parma had no interest in getting involved in the turnkey program.

Parma's conduct with regard to "Section 8" housing also illustrates a consistent policy of resistance to all forms of low-income housing. Under Section 8,[34] the principal family subsidized program since 1972 (Tr. 604–605), a qualified family or individual pays between 15 and 25% of its income for rent and the government subsidizes the difference between that amount and the fair market rent (Tr. 554). This program includes the use of existing housing, rehabilitation and new construction (*id.*).

There is no need for a metropolitan housing authority to be involved directly with the Section 8 program (Tr. 605). It is also not necessary that a municipality enter into a cooperation agreement with a housing authority in order to have regular Section 8 housing placed within a community (Tr. 605). A private developer can simply respond to a HUD notification and rehabilitate units without CMHA or municipal involvement (Tr. 571). However, although specific municipal approval is not required in order to build Section 8 projects (other than a building permit), a municipality does play an important role. It can help the program by assisting project sponsors in finding acceptable sites, bringing needed utilities to the site, and using community development funds for access roads or road improvement (Tr. 569). A community also can facilitate Section 8 programs by setting up places where residents can apply for certification, and by informing them about the program and how much they can save if they are eligible. Additionally, a municipality can inform landlords about Section 8 housing and its advantages (Tr. 654–655). While these actions are all voluntary, they may be crucial to the successful development of Section 8 low-income housing.

Although the Section 8 program does not require the involvement of a metropolitan housing authority, CMHA can get involved in the management of Section 8 projects as it has in Berea, Cleveland Heights and University Circle. CMHA can also issue certificates to qualified individuals to live in private apartments which have met HUD standards (Tr. 647–648).

The Section 8 program has worked well in the Cleveland metropolitan area. It has provided housing for approximately 3400 families, half of whom live outside of Cleveland (Tr. 651). The program also has offered substantial opportunities for low-income blacks. In 1979, 2015 of the 3389 families with Section 8 certificates were black (Gov. Ex. 17). Of the 765 families on the 1979 waiting list, 684 were black (Gov. Ex. 15), and of the 313 elderly households on the waiting list, 109 were black (*id.*). The Section 8 program also has resulted in the movement of some blacks to the western suburbs. A newly constructed project in Berea, for example, has 108 units of which 37 are occupied by blacks. Six of these black families were from Berea, while 32 moved to the project from the east side of Cleveland (Tr. 655–656).

Parma has refused to participate in the Section 8 program. Mayor Petruska testified that he may have received literature regarding the program from CMHA and that he did not recall his or anyone else from Parma's attending any meetings on the matter (Petruska dep. 280–281). The record clearly establishes that Mayor Petruska received information about Section 8 housing. On August 13, 1975, CMHA sent a letter to Petruska notifying him of a meeting about the Section 8 program to be held on August 28, 1975 (Gov. Ex. 116). An identical letter was sent to John Zielinski, the President of Parma's City Council (Gov. Ex. 117). At that meeting, it was explained how municipalities could help in marketing the Section 8 program and how their resi-

---

**34.** Section 8 of the United States Housing Act of 1937, as amended by Section 201(a) of the Housing and Community Development Act of 1974, 42 U.S.C. § 1437f, and by the Housing Authorization Act of 1976, § 2, 90 Stat. 1068.

dents could apply to and be certified for the program (Tr. 653). Although representatives from 27 other communities attended the meeting (Tr. 653), no one from Parma was there (Tr. 651). In this city of over 100,000, there are only 48 people who have been able, without Parma's help, to find existing housing under the Section 8 program. Of that number, 12.5 per cent are black (Gov. Ex. 17).

### 3. *The Effect and Intent of Parma's Actions*

Parma's opposition to any form of public or low-income housing has had an acute and foreseeable segregative effect on this virtually all-white city. Statistics reveal that most public housing and Section 8 tenants in the Cleveland metropolitan area are black; the same is true of the waiting lists for those programs. Moreover, in instances when public housing or Section 8 projects have been built in white neighborhoods on the west side or in the western suburbs, blacks frequently have taken advantage of those opportunities and have moved into those projects. For the thousands of other black families eligible for such housing and living in Cleveland who want to move to the suburbs [35] (*see* Gov. Ex. 22), the inability to secure affordable housing represents a serious and generally insurmountable barrier.

In the face of this segregative effect, and against the needs of many of Parma's own residents for public or low-income housing, Parma offers only one explanation in this record for its actions. This is Mayor Petruska's explanation that public housing means CMHA involvement, and because he considers CMHA to be incompetent he will have nothing to do with public housing. The Court rejects this explanation as not supported by the evidence. Rather, the Court finds that the desire to keep Parma all-white has become a primary factor behind the City's decision to prevent any public or low-income housing from being built.

The evidence clearly demonstrates that Parma has opposed all public and low-income housing, irrespective of CMHA's involvement. In 1971, when Mayor Petruska was running for re-election, he explained in an open letter to the community that he supported a controversial housing project because it was composed of "luxury" apartments.[36] In the same letter, and in large bold type, he stated, "Mayor Petruska IS OPPOSED TO PUBLIC HOUSING IN PARMA". In this letter to the electorate, Mayor Petruska concluded, "I want to emphasize that I am COMPLETELY OPPOSED TO ANY TYPE OF PUBLIC OR LOW INCOME HOUSING IN THE CITY OF PARMA." (Gov. Ex. 75). Again in 1975, in another re-election campaign, Mayor Petruska once more announced his opposition to public or low-income housing and stated that none was needed in Parma (Tr. 1375, 1376; Gov. Ex. 105).

At trial and in his deposition, Mayor Petruska testified that his strong public opposition to all public and low-income housing resulted only from the fact that no proposal for such housing was before the City at those times (Tr. 1374–1376; Petruska dep. 200). At best, with respect to the 1971 campaign statements, this assertion is incorrect since the Parmatown Woods proposal was under active consideration. *See* pp. 1081–1083, *infra.* When asked under oath about his position on public or low-income housing, Mayor Petruska refused to take a position, saying, "I can't make any general statements in my business." (Petruska dep. 276). Mayor Petruska's position for this litigation, and the position he represented to the people of his community in

---

**35.** No accurate figure exists regarding the number of low-income blacks who desire to move to Parma. One study places the total number of persons wishing to move to Parma at 1300 (Gov. Ex. 22). There is no evidence to indicate that even with Parma's racially exclusionary image, substantial numbers of blacks are not included in that number.

**36.** The Mayor stated that the apartment units "are not federally financed housing, are not low income and are not senior citizen housing. Rather, they are high quality, high priced units with starting rates of $175 for a one bedroom apartment on up to $270 per unit." (Gov. Ex. 75).

two successive mayoral campaigns are contradictory. His public position uniformly and all-inclusively opposed low-income or public housing. This Court does not believe that Mayor Petruska twice deliberately misrepresented his position on public and low-income housing to his constituency.

Mayor Petruska testified that the statements contained in his campaign literature relative to public housing were made in the belief that the CMHA would be involved in the management of the property (Tr. 1336).[37] Certainly his public statements on this matter contain no such qualification or reservation. Rather, they reveal a complete opposition to all forms of public housing. In any event, it is clear that some forms of public and low-income housing can be met without CMHA involvement.[38] Thus Mayor Petruska's allegation that CMHA management shortcomings led him to oppose low-income housing appears to be a present rationalization. The record is devoid of any evidence that Mayor Petruska or any other Parma official had criticized CMHA's operations in the past, even though they had many obvious opportunities to do so. Indeed, members of the Parma City Council could not recall even a single conversation during Council meetings about CMHA. Wojas dep. 124–125; Kopchak dep. 154–155).

At trial, Mayor Petruska testified that CMHA operations had been "going downhill year by year" (Tr. 1358), an observation he allegedly formed by driving by different projects in Cleveland, and reading newspaper articles and other reports about CMHA (Tr. 1332–1333).[39] But Mayor Petruska also

has stated that he goes to Cleveland only two or three times a year (Gov. Ex. 30, p. 14), that he does not know that the east side of Cleveland is heavily black (Petruska dep. 47–48), and that he does not necessarily trust what he reads in the newspaper (Petruska dep. 62, 111) or in reports.[40] In any event, the Court cannot believe that Mr. Petruska would not have expressed publicly these deep and long-standing criticisms of CMHA if he had really held them.

Finally, the Court notes that Mayor Petruska equates public and low-income housing with housing for blacks. In 1971, when asked how he or any other city official as a Christian could exclude people of any race or color from residing in Parma, he immediately responded (Petruska dep. Ex. 13):

Neither I or to my knowledge any other city official favor discrimination. I personally do object to any plan for the *creation of low-income housing* since I do not feel that this is a problem for tax payers to absorb . . . I do not believe that destroying our community by creating Cleveland's problems within our city will achieve any overall good for anyone of any color or race. (emphasis added)

Apparently, in Mayor Petruska's eyes, Cleveland's problems and low-income housing both translated into blacks, since his response to a question of race was answered in such terms. On another occasion when he was asked about low-income families, Mayor Petruska began to talk in terms of "blacks" (Petruska dep. 106). The evidence shows that Parma's mayor equates low-income housing with blacks.

**37.** At trial, Mayor Petruska testified that he was not opposed to public housing in Parma if CMHA were not involved and added "as a matter of fact, we have such a project" (Tr. 1337). There is no evidence in this record that such a project exists; in fact, the record refutes this claim.

**38.** Parma, for example, could participate in the Section 8 program without CMHA. And even in the area of conventional public housing, Parma officials were well aware that such housing could be built without CMHA involvement (Tr. 1377–1378; Petruska dep. 212).

**39.** Parma relies on a 1973 study to prove that CMHA's operations were inadequate (Def. Ex. DS). There is no evidence in the record to indicate that Mayor Petruska had ever read or been aware of the study prior to trial in 1979.

**40.** *See, e. g.* Mayor Petruska's views of HUD reports showing Parma's need for low-income housing (Tr. 1382, 1384; Petruska dep. 221–225).

This equating of low-income housing with blacks is not limited to Mayor Petruska. When a specific low-income housing proposal was brought before the City by a private developer there was passionate opposition from Parma residents and city officials on the overtly stated ground that blacks might move into this project. *See* pp. 1077–1081, *infra.*

This Court does not believe that low-income housing should be equated to blacks. Blacks have not been the only victims of Parma's opposition to low-income housing. Unfortunately, many of Parma's own residents have suffered by being unable to obtain needed housing because of the City's fear that blacks would be among the beneficiaries.

## C. THE DENIAL OF A BUILDING PERMIT FOR PARMATOWN WOODS

In 1971, there was a genuine need for low-income and senior citizen housing in the City of Parma. In response to this need, a local developer, Forest City Enterprises, proposed to construct a federally subsidized multi-family housing project. This project was to be named Parmatown Woods. Up to this time, there never had been any federally subsidized low-income housing in Parma. (Tr. 573, 1252; Reinke dep. 201). Applications for the building permits needed for construction of Parmatown Woods were submitted by Forest City Enterprises to Parma officials. After review, the building permits were denied, allegedly because of non-compliance 'with Parma's land-use ordinances. The Court finds that an important reason for the denial of the building permits was the fear that blacks would live in Parmatown Woods. This fear resulted in deviations from standard procedure and substantive norms and rendered impracticable, if not impossible, compliance with the land-use ordinances.

### 1. *The Background of Parmatown Woods*

The crucial question concerning the rejection of the building permits for Parmatown Woods is whether Parma's stated reasons for rejecting them are the true reasons or whether they mask a racially discriminatory motive. In addressing this question, the rejection of Parmatown Woods cannot be considered in a vacuum. To discover whether procedural and substantive norms were followed, the treatment accorded Parmatown Woods must be compared with the treatment Parma gave to other multi-family high-rise housing projects which were proposed and built around the same time.

No building construction can commence in Parma before issuance of a written permit by the Building Commissioner in accordance with the Zoning Code or other city regulations. Parma, Oh., Planning and Zoning Code § 1125.02. The permit is not to be issued until plans for the development are complete and accepted (Vittardi dep. 43). According to Parma's Building Commissioner, Jerry Vittardi, the plans which are submitted for "just about every apartment development" are incomplete, and therefore it is necessary for the developer to submit revisions (*id.*) Under local regulations, a permit is not to be issued until these revisions have been accepted. However, the treatment accorded four apartment complexes—Midtown Apartments, Regency Towers, Parmatown Gardens, Parmatown Towers—indicates that the formal regulations and procedures regarding the issuance of building permits in the City of Parma have not always been adhered to.

On April 4, 1968, an application for a building permit for Midtown Apartments, a three building four-story apartment complex, was filed with Parma. After this filing, the City's Engineering Department determined that the plans for the complex were deficient because revisions needed to be made in the plans for the Building "C" of this Apartment complex. In spite of the fact that the original plans were deficient, a building permit was issued on September 2, 1968 which permitted construction to begin on Buildings "A" and "B" of the complex. Approval of Building "C", and therefore approval of the total plan as originally submitted, was withheld subject to revision of the plan and subsequent approval by the City. A resubmission of the plans in 1969

resulted in an additional request by Parma officials for further changes. A final submission of the plans was made to the City in September 1969, one year after the original building permit had been issued which allowed construction to begin on the project (Gov. Ex. 72, 73).

Another example of the failure of Parma to follow formal rules and regulations is evident in the treatment accorded Regency Towers. In 1971, an application for a building permit for Regency Towers, another multi-family high-rise apartment complex, was submitted to Parma's Building Department at a time when there was the threat of a moratorium on water connections by the City of Cleveland (Reinke dep. 32, 123). In order to cooperate with the builders of the project complex and allow them to obtain a water connection prior to the moratorium's taking effect, the Parma Building Commissioner issued a building permit before the full set of plans were reviewed for compliance with the City's ordinances (Reinke dep. 123–124). Thus, the developer was issued a permit which allowed construction to begin before Parma approved the plans for the building,[41] although a building permit for an apartment building should not have been issued until the plans had been approved by the City Engineer (Vittardi dep. 31).

The Parmatown Gardens development is a third example of Parma's failure to follow formal procedures for the issuance of a building permit. Plans for the construction of Parmatown Gardens were submitted by Forest City Enterprises in 1972, and after review by city officials, a building permit was issued (Reinke dep. 126). After this building permit was issued, Forest City was allowed to revise its plans for Parmatown Gardens by changing the allocation of bedroom units in the complex (Reinke dep. 126–127). The plans for Parmatown Gardens therefore were reviewed twice—once before the building permit was issued and once after it was issued (id. at 127). Even though revisions in plans are supposed to be made before a building permit is issued (Vittardi dep. 43), a revision of the Parmatown Gardens plans was allowed because Parma felt it would "cooperate" with Forest City, which said it had made a mistake in drawing up its plans for the complex (Reinke dep. 127).

The fourth example demonstrating the flexibility of the process for issuing building permits is the Parmatown Towers development, a 10-story multi-family housing complex which was built on land immediately adjacent to the land on which the proposed Parmatown Woods complex was to be built (Tr. 585–586; Reinke dep. 32).[42] The Parmatown Towers proposal was first submitted to the City of Parma by Forest City Enterprises in 1968. The proposal was not approved because the developer was not able to obtain the necessary rezoning (Dunning dep. 10–13). Although the City Council voted 8 to 4 to grant the rezoning request (Sands dep. 47), Mayor Petruska vetoed the proposal (Tr. 1174, 1320–1321).[43]

---

**41.** There is no evidence in the record indicating whether construction actually began prior to approval of the plans or whether there was a tacit understanding not to commence construction until final plans were approved (Reinke dep. 170–171). In either case, the normal procedures for building permit issuance were not followed.

**42.** The complex was built under a HUD program entitled Section 221(d)(4), which is not a government subsidy program, but under which the building mortgage is insured by the Federal Housing Administration (Tr. 585–586, 618–619).

**43.** Forest City asked the Parma City Council to rezone the parcel of land from residential to high-rise classification E–5, which would allow construction up to 100 feet high (Dunning dep.

10–13; Sands dep. 51). The rezoning proposal attracted both support and opposition. The Parma Chamber of Commerce and the Board of Education voiced their support for the proposal (Gov. Ex. 49, 50, 51) citing, among other things, the increase in tax dollars which the proposed new apartment development would bring into the City. Paul Kisil, a Parma City Councilman at the time, felt that the rezoning was good planning for Parma (Kisil dep. 36). Opponents of the proposed rezoning of the Parmatown Towers site claimed that the new apartment complex would cause sewer and traffic problems (Sands dep. 47–48; Dunning dep. 27–28; Kopchak dep. 15; Tr. 1282–1283), was not safe from a fire standpoint (Kopchak dep. 15; Dunning dep. 27–28), and would be too high (Kisil dep. 25).

This was not the first time that opposition had been voiced concerning high-rise apartments. In 1963, when the high-rise classification was made part of the Parma Zoning Code, referendum petitions opposing the classification were circulated among the electorate, but the issue was never placed on the ballot due to the failure to obtain enough signatures (Tr. 1177–1178).

In 1969, Forest City again attempted to obtain rezoning for its proposed site and this time was successful (Tr. 1176; Dunning dep. 42–43). Objections to rezoning, such as possible traffic and sewer problems (Sands dep. 55), were overcome when Forest City touted the new apartments as "luxury" apartments (Dunning dep. 42–43, 49, 156–157; Sands dep. 56–60). Some members of the City Council who had opposed rezoning in 1968 now voted in favor of it because of an "impressive blue booklet" distributed by Forest City which emphasized the luxury nature of the apartments (Dunning dep. 156–167). The Council now approved rezoning for the site of this six-story luxury apartment complex by a vote of 11 to 1 (Sands dep. 54). Mayor Petruska, who had vetoed rezoning the year before, explained why he changed his position and now favored construction of the Parmatown Towers development (Gov. Ex. 75, p. 2). The apartments, he wrote:

ARE NOT FEDERALLY FINANCED HOUSING, ARE NOT LOW INCOME AND ARE NOT SENIOR CITIZEN HOUSING. RATHER THEY ARE HIGH QUALITY, HIGH PRICED UNITS WITH STARTING RATE OF $175 FOR A ONE BEDROOM APARTMENT ON UP TO $270 PER UNIT. (emphasis in original)

It was the "luxury" nature of the apartment complex that prompted Mayor Petruska not to veto the rezoning change.

The next official action concerning Parmatown Towers occurred on March 9, 1971. The portion of Ames Road on which Parmatown Towers was to front had not been dedicated to the City (Tr. 1196, 1233). On March 9, Forest City appeared before the Parma Planning Commission to dedicate Ames Road to the City and asked the Planning Commission to accept the dedication for record purposes only (Tr. 1194; Gov. Ex. 77, 82). Forest City explained that the Cleveland Water Department had threatened a ban on future water hook-ups (Tr. 1194) and that before the Water Department would review the plans for Parmatown Towers, the street dedication had to be accepted for record purposes (Tr. 1195). Later that day, the Parma Planning Commission accepted the dedication of that portion of Ames Road on which Parmatown Towers is located for record purposes only, "with no further obligation on the City until such time as Council actually accepts proper dedication" (Tr. 1193, 1235–1236; Reinke dep. 174; Gov. Ex. 77).

 The significance of this very limited dedication acceptance by the Planning Commission for "record purposes only" is understood when one looks at Parma's Planning and Zoning Code (Gov. Ex. 123). Parma ordinances § 1101.06(d) and § 1101.-08 provide that a building permit can be issued by the City of Parma only if the street on which the proposed development is located is dedicated to the City and officially accepted by the City Council (Tr. 1234–1235). These ordinances also make it clear that only official acceptance of a dedicated street by the Parma City Council obligates the city to provide services such as rubbish and garbage pickup and maintenance of street improvements. The Planning Commission of Parma realized these facts on March 9, 1971, when it accepted the Parmatown Towers dedication for record purposes only. This is evidenced by the Planning Commission's disclaimer of provision of city services and its recognition of the future necessity for "proper" Councilmanic dedication (Gov. Ex. 77). In light of the foregoing, this Court finds that the March 9, 1971 acceptance of the Ames Road dedication by the Parma Planning Commission was not the official Councilmanic acceptance of a street dedication envisioned by the Planning and Zoning Code, and that such ac-

ceptance did not authorize the issuance of a building permit for Parmatown Towers.

Actions taken by the City of Parma with regard to Parmatown Towers subsequent to the March 9, 1971 meeting of the Planning Commission indicate that Parma did not consider such things as street dedication ordinances and normal city administrative procedure to be barriers to construction. Rather, the manner in which the Parmatown Towers matter was handled indicated that Parma would bend the rules when it wished to cooperate with a developer of a non-subsidized multi-family housing project. In spite of the fact that the Parmatown Towers plans submitted by Forest City to the City of Parma were not finally approved until a short time after the Planning Commission meeting of May 11, 1971 [44] (Gov. Ex. 85; Tr. 1225, 1259, 1172–1173; Petruska dep. 15), the building permit for Parmatown Towers was issued on March 23 and 24, 1971 (Gov. Ex. 84, 76; Tr. 1196, 1237) with no conditions attached, as far as the City of Parma was concerned (Tr. 1197; Gov. Ex. 84).

The issuance of a building permit for Parmatown Towers in March 1971, some two months before approval of plans by the Planning Commission was contrary to stated administrative procedures. As noted above, a building permit could not be issued under the local ordinances until the developer's plans had been approved by the City Engineer. Issuance of the Parmatown Towers building permit prior to plan approval was done by Parma "in the spirit of cooperation" with Forest City. The developer was thereby allowed to avoid a threat-ened ban on water hook-ups which never occurred (Reinke dep. 123, 127–128).

The "spirit of cooperation" which had led Parma to ignore standard procedure in the issuance of the building permit carried the City one step further. The building permit for Parmatown Towers was issued in violation of Planning and Zoning Code § 1101.06 which requires the dedication and Councilmanic acceptance of a street before a building permit for development on that street can be issued (Gov. Ex. 123; Tr. 1234; Wojas dep. 56). The official Councilmanic acceptance of the March 9, 1971 dedication of Ames Road, which was the legal prerequisite for the issuance of the Parmatown Towers building permit, did not occur until August 14, 1972 (Gov. Ex. 78; Tr. 1236–1237) almost a year and a half after the building permit was actually issued.[45]

Based upon the manner in which the building permits were issued for construction of the Midtown Apartments, Regency Towers, Parmatown Gardens and Parmatown Towers multi-family development, the Court finds that Parma's official regulations and standard procedures are applied flexibly. These four examples demonstrate that when Parma officials are in favor of a proposed development, they try to accommodate the developer, and will issue building permits even when not authorized under stated procedures and local ordinances.

### 2. Racial Opposition to Parmatown Woods

In 1971, Forest City Enterprises submitted plans for the construction of a multi-family housing development to be called

---

**44.** The minutes of the Planning Commission meeting of May 11, 1971 (Gov. Ex. 85) indicate approval of the Parmatown Towers development subject to an opinion of the City Solicitor, Andrew Boyko, on the legality of a change from a six to ten-story building. Boyko subsequently issued an opinion stating that such a change could be made legally (Tr. 1172–1173).

**45.** Parma's decision was to ignore the requirement of Planning and Zoning Code § 1101.06; it did not result from unawareness. Russell Rienke, the City Engineer of Parma who reviews building plans and has been doing so for

eleven and one-half years (Tr. 1186; Reinke dep. 5–6), has knowledge of this Parma ordinance requiring acceptance and dedication of a street before the issuance of a building permit (Tr. 1233). Jerry Vittardi, the Building Commissioner who has been issuing building permits for over six years (Vittardi dep. 28, 30), is also knowledgeable with regard to this ordinance (id. at 65). It is the responsibility of both of these men in the normal course of business to check compliance of any proposed development with this ordinance (Reinke dep. 129).

Parmatown Woods. The proposed project was to be financed by the use of federal housing subsidies under Section 236 of the National Housing Act, 48 Stat. 1246, as added and amended, 12 U.S.C. § 1715z–1. The Section 236 program was a low-income housing program administered by HUD in which the federal government subsidized the project mortgage above a certain interest rate. The federal interest subsidization resulted in reduced rents for the apartments in the project. The Section 236 housing program, which is no longer being funded (Tr. 809, 282), was aimed at low and moderate-income persons. At the time of the proposal of Parmatown Woods, every Section 236 project was encouraged to have 20% of its units occupied by families receiving federal subsidies in the form of rent supplements. A Section 236 project with rent supplements would have a larger proportion of low-income persons than a normal Section 236 project because rent supplement income levels were set at public housing levels (Tr. 566–567).[46]

In February 1971, the Planning Commission of Parma discussed the possibility of securing senior citizen housing (Gov. Ex. 47). Following this meeting, Donna Smallwood, the Senior Citizen Director of Parma, undertook a survey of the housing needs of senior citizens. The results showed that most people who responded were interested in senior citizen housing, and that interest was not limited to residents of Parma (Smallwood dep. 16–17). At another Planning Commission meeting, held in March 1971, Frank Celeste of National Housing Consultants made a presentation relative to senior citizen housing for Parma (Tr. 1286).

Around the time that Parma officials were considering additional senior citizen housing, Forest City was studying the feasibility of constructing Parmatown Woods.

One of the studies pointed out that the proposed complex would be "orientated to the elderly" (Gov. Ex. 53).

Parmatown Woods first began taking some type of tangible form in the spring of 1971, when Forest City submitted to the Cleveland Office of HUD an application for a proposed Section 236 apartment complex to be located in Parma, Ohio (Tr. 576; Gov. Ex. 53). The original application of Forest City proposed the construction of a complex containing 408 units (Tr. 574, 576), but the number of units was later cut back to 201 units due to lack of HUD funds. At the time, John Kasulaitis, Chief of Housing Programs at the Cleveland HUD office, was employed by HUD as a multi-family appraiser, and he personally appraised the proposed Parmatown Woods site. Mr. Kasulaitis, who had appraised over 100 other multi-family sites, believed that "as multi-family sites go, [the Parmatown Woods site] was one of the best you could ever want to have, and the location was excellent because it was close to all kinds of amenities." (Tr. 559).

Parmatown Woods, also referred to as Parmatown Towers Phase II, was presented formally to the City of Parma on June 22, 1971 at a meeting of the Parma Planning Commission (Gov. Ex. 59). At that meeting, William Warren of Forest City explained that Parmatown Woods would consist of two ten-story buildings containing 408 units, which were to be financed under the HUD Section 236 program. Warren also told the Planning Commission what the rents for the proposed project would be and that such rents were set by the federal government and could not be raised (id.). After Warren told the Planning Commission that Forest City would request a variance from the 2½ parking spaces per apartment unit required by Parma down to one

<hr/>

46. The differences between a Section 236 project such as Parmatown Woods and a project such as Parmatown Towers, developed under the Section 221(d)(4) program of HUD, were twofold: (1) a Section 221(d)(4) project did not receive any federal subsidy, but only had its mortgage insured by the federal govern-ment (Tr. 618–619, 585–586), and (2) a Section 221(d)(4) project was aimed more at moderate income persons than low-income persons. Generally persons with higher incomes would live in a building like Parmatown Towers rather than in a building like Parmatown Woods (Tr. 619).

space per unit, the proposal was referred to the Regional Planning Commission for study and recommendations, with special attention to such things as elevators, laundry facilities and security (*id.*; Tr. 1292–1293).

On July 6, 1971, Forest City made a presentation concerning Parmatown Woods to members of the City Council of Parma (Kopchak dep. 52–54). At that meeting, Sam Miller of Forest City stated that the proposed 10-story senior citizen complex would be similar in appearance to Parmatown Towers and would be for Parma senior citizens (*id.*), but that the rents in the proposed complex would be lower than those in Parmatown Towers because Parmatown Woods was to be built under Section 236 (*id.* at 55). Parma officials understood at that time that the rents in Parmatown Woods would be lower because the federal government was paying part of the interest on the building mortgage (Petruska dep. 89; Smallwood dep. 37–38), and that a Section 236 project could have a federal rent supplement program within it, and that this also would lower rents (Dunning dep. 118).

On July 13, 1971, a second meeting of the Parma Planning Commission was held to consider the Parmatown Woods proposal. A representative of the Regional Planning Commission made the report on Parmatown Woods which had been requested at the June 22, 1971 Planning Commission meeting (Gov. Ex. 60). The report indicated, among other things, that the proposed development was in a desirable location and was within the appropriate zoning district (Gov. Ex. 60; Petruska dep. 88). After the Regional Planning representative made his presentation, Parma officials began to express a concern about the type of residents expected to live in the Parmatown Woods complex. Evelyn Kopchak, a Parma City Councilwoman, questioned whether residents of Parma could be given a preference in renting the units in the proposed development (Gov. Ex. 60; Kuczma dep. 96; Kopchak dep. 68–71). She was advised by William Warren of Forest City that HUD had been contacted, and that an official had assured him that Parma applications could be processed "without violating the restrictions." (Gov. Ex. 60). Donna Smallwood then suggested the possibility of setting up a type of "screening committee" for applicants at Parmatown Woods (*id.*; Kuczma dep. 96; Smallwood dep. 44), to which Mr. Warren responded that Forest City would be agreeable (Gov. Ex. 60). Ms. Kopchak was concerned about whether the proposed development could be sold to CMHA by Forest City (*id.*; Kuczma dep. 96; Kopchak dep. 68–71; Petruska dep. 93). While Parma officials such as Kopchak and Smallwood voiced their concern over the prospective residents of Parmatown Woods, an underlying fear of Parma—the fear that black persons might be moving into Parmatown Woods—was brought out into the open by the two highest ranking elected officials in the City of Parma—the President of the City Council and the Mayor of Parma.

Kenneth Kuczma was the President of the Parma City Council in 1971 (Kuczma dep. 10–12) and was in attendance at the July 13, 1971 meeting (Gov. Ex. 60). Kuczma took the floor and stated, "*I do not want Negroes in the City of Parma*" (emphasis added) (Gov. Ex. 118; Tr. 66–67). Kuczma felt that this was the real issue at stake in the construction of Parmatown Woods and his statement was meant to force everyone to face the issue realistically (Gov. Ex. 118; Tr. 66–67). Kuczma stated that the people of Parma, all of whom he considered as his constituents (Kuczma dep. 58), were fearful of Negroes coming into the City and that he himself had that fear (Kuczma dep. 100; Kuczma dep. Ex. 3, p. 13). He thought that many residents of Parma had moved there from the east side of Cleveland where they had suffered considerable losses in the sale of their real estate due to an influx of Negroes (Gov. Ex. 118; Tr. 66–67). He also felt that a movement of Negroes into low-cost housing in Parma would cause the community to deteriorate (Kuczma dep. 117–119).

Immediately after Kuczma stated that he did not want Negroes in Parma, and after

some people had gone off on "a tangent about black versus white" with regard to Parmatown Woods (Petruska dep. 107–108), Mayor Petruska sought to assuage the fears previously expressed at the meeting. In response to the statements of Kenneth Kuczma and the Parma public who were there, Petruska assured those present that even if Parmatown Woods were constructed, it would not mean that the doors of Parma would be open to the entire "East Side of Cleveland" (Gov. Ex. 119; Tr. 62, 63, Tr. 1359; Petruska dep. 107–108).[47]

At the end of the July 13, 1971 meeting, the Parma Planning Commission "approved" Parmatown Woods, but with two qualifications. First, the Parma Zoning Board of Appeals was to give special attention to possible problems such as the need for additional elevators, full security requirements and a change in laundry facilities. Second, and most critical, the Zoning Board was told that any parking variance should carry with it a restriction "strictly for senior citizens" and any other use of the buildings would cause the variance to lapse (Gov. Ex. 60).

By early October, Parma officials had learned some disquieting news. Councilwoman Kopchak, who had contacted local HUD officials, wrote a letter to Mayor Petruska on October 6, 1971 advising him not only that Parmatown Woods would be low-income housing, but also that it would be open "to anyone who meets the income limitation imposed by the Federal Government and cannot be limited strictly to Senior Citizens." She also noted that "[i]t is doubtful that any stipulations can be imposed whereby the apartments would be limited to Parma residents." (Gov. Ex. 62).

Around this time, Mayor Petruska also was notified of a letter from HUD Secretary George Romney which described Parmatown Woods as a project with two sections—one for elderly and the other for low and moderate income families. In response to these two letters, Mayor Petruska urgently sent telegrams to Secretary Romney and other officials requesting all information dealing with applications for low-income housing within Parma, "so my citizens may have an honest and detailed report of something that greatly concerns them." (Def. Ex. X).

Against this background of intense concern over low-income housing and the possibility of blacks moving into Parma, Parma officials decided to meet with HUD officials to discuss the Section 236 program and Parmatown Woods. Council members Mary Dunning and Kenneth Kuczma tried to set up a meeting with HUD (Tr. 274, 1288–1289; Dunning dep. 64). In response to a call from a Parma official, Charles Lucas, then the Deputy Director for the Cleveland insuring office of HUD (Tr. 269), invited representatives from Parma to a meeting in his office on October 20, 1971 to discuss the Section 236 program (Tr. 274). Before the meeting, however, several Parma officials called him (id.). One call was from Council member Mary Dunning, who wanted information about the Section 236 program and Forest City's involvement in it. Lucas, a black, invited her to attend the October 20th meeting. Dunning said: "Do you know that we don't want blacks in Parma?" Avoiding a response, Lucas said "Don't we?" and Dunning hung up (Tr. 275).

The October 20, 1971 meeting was attended by Lucas, two other HUD officials and eleven Parma officials (including 9 of 11 City Council members) (Gov. Ex. 66). Lucas was asked questions about the Section 236 program, but most of the questions

---

**47.** Parma seeks to discount this statement by asserting that Mayor Petruska, and indeed all members of the Planning Commission, favored the Parmatown Woods proposal. The evidence does not support this assertion. Although Mayor Petruska voted to "approve" the proposal at the end of this Planning Commission Meeting, the "approval" was conditioned on terms that made construction of the project impossible. Moreover, *after* the July 13, 1971 meeting, Mayor Petruska stated publicly that proper plans had not yet been filed for the proposal and that "[u]ntil proper plans are filed, we really have no accurate facts for anyone to make a decision—all we have is speculation" (Gov. Ex. 75, p. 2).

evidenced the same concern of Parma officials over the prospective residents of Parmatown Woods which had been shown previously at the July 13, 1971 Planning Commission meeting (Tr. 278–280). Lucas responded negatively to questions concerning whether Parmatown Woods could be exclusively for Parma residents (Tr. 278, 1290, 539; Kuczma dep. 138–140; Kopchak dep. 119–122; Smallwood dep. 108; Sands dep. 70–71) and whether Lucas could give an assurance that Parmatown Woods would not be sold to the Cuyahoga Metropolitan Housing Authority or become public housing (Tr. 280, 538; Sands dep. 72; Dunning dep. 132–133; Kuczma dep. 138–140). Lucas was asked whether "blacks from Hough and Puerto Ricans from West 28th Street" could become tenants and he replied affirmatively (Tr. 279). Finally, Lucas made it clear to the Parma officials in attendance at the meeting that Parmatown Woods would be open to any low-income persons, and not just to senior citizens (Tr. 1290; Dunning dep. 69; Kopchak dep. 119–122). Apparently, the responses of Mr. Lucas to the questions of the Parma officials were not totally to their liking, and Mr. Lucas characterized the meeting as being "as heated and acrimonious as any" he had ever attended (Tr. 281).

On October 21, 1971, the day following the meeting of Parma officials with Charles Lucas at his office at HUD, John Kasulaitis, a HUD official who had been in attendance at that meeting (Gov. Ex. 66), attended a meeting sponsored by the Catholic Ladies Guild of St. Anthony's Parish of Parma in St. Anthony's Parish Hall (Tr. 539–540). At this meeting, Kasulaitis made a presentation concerning Section 236 and other HUD housing subsidy programs and explained the differences between them and public housing (Tr. 540–541). After his presentation to about 130–140 people, including several Parma City Council members in attendance, Kasulaitis was asked questions from the floor concerning in particular whether the HUD subsidy programs were public housing (Tr. 541). He was asked whether Parmatown Woods could become public

housing and whether persons from the "East Side" of Cleveland could become tenants there. After the meeting, Kasulaitis was approached by persons who expressed opposition to the Parmatown Woods project because they expected blacks to become residents (Tr. 540–546).

The testimony of Parma officials further underscores the concern of people in Parma about who would be the residents of Parmatown Woods and more specifically, about whether these residents would be black. Stanley Wojas, City Councilman, received phone calls from his constituents asking if Parmatown Woods was to be for Parma residents only (Wojas dep. 84). He also was asked questions about the race of those persons who were expected to reside in Parmatown Woods (*id.* at 83). John Sands, City Councilman, was asked by other City Council members whether "public housing tenants" could live in Parmatown Woods (Sands dep. 65, 74) and was also asked by Parma citizens whether he was bringing black people into Parma through Parmatown Woods (*id.* at 103). Donna Smallwood, Parma's Senior Citizen Director, testified that some senior citizens asked her whether blacks would be moving into the Parmatown Woods project (Smallwood dep. 153–157). As Smallwood put it, people were concerned about whether the building would be "open to anyone" (*id.* at 158).

The evidence leaves no doubt that the prospective racial make-up of Parmatown Woods was of concern to Parma public officials and their constituents. The fear that blacks might reside in Parma was a decisive source of opposition to Parmatown Woods.

3. *The Rejection of Parmatown Woods*

The fear of blacks moving into Parma was, of course, not the sole source of opposition to Parmatown Woods. The relationship that existed between Parma officials and Forest City could not be characterized as overly friendly. A credibility crisis had erupted when Forest City unilaterally changed its plans for Parmatown Towers from a six-story to a ten-story building (Dunning dep. Ex. 1). There also was some

concern that Forest City was going back on its promise to build "high-quality" units (*id.*) and that it had misrepresented or furnished inaccurate facts to the City Council (Tr. 277–280).

In addition, considerable confusion developed among Parma officials concerning the nature and purpose of the Parmatown Woods project. HUD Secretary Romney, in a letter to Representative Minshall which was forwarded to Mayor Petruska, described Parmatown Woods as an Operation Breakthrough project consisting of two phases: elderly and low or moderate-income families (Def. Ex. W). However, the Regional Planning Commission, in a letter addressed to Mayor Petruska and dated October 7, 1971, stated that except for the use of the same construction techniques "there is no relationship between Operation Breakthrough and the senior citizen project, Parmatown Woods." (Def. Ex. Y). Two other letters from HUD officials to Mayor Petruska, dated October 14, and October 29, attempted to clarify the expression "Operation Breakthrough" and the status of Parmatown Woods (Def. Ex. AA, AC). Adding to the confusion was an ongoing political campaign in the fall of 1971, in which certain of Parma's public officials believed their stands on specific issues, including the Parmatown Woods proposal, were being misstated by their opponents and the press (Petruska dep. 199–200).

During this period of confusion and controversy, the plans for Parmatown Woods were reviewed by personnel at HUD and by local officials in the Parma Building and Engineering Departments. In the summer of 1971, a project analysis was submitted to HUD. On August 5, 1971, HUD officials appraising the project requested assurances from Forest City that 201 parking spaces would be acceptable to the City of Parma. HUD also requested assurances that a proposed street from the project site to Day Drive would be dedicated to and accepted by Parma (Def. Ex. T). HUD discussed numerous other problems with Forest City.[48] A conceptual plan submitted by Forest City on August 25, 1971 finally was found acceptable by HUD on October 26, 1971 (Def. Ex. AB).

Parma officials received the initial applications for building permits for Parmatown Woods on July 30, 1971. The building permit applications were for two ten-story buildings containing 201 units each (Gov. Ex. 64, 65; Vittardi dep. 49, 51). In late August, Forest City was advised by the Safety Director of Parma that the building permits could not be issued because the plans were incomplete (Gov. Ex. 55).

In early October 1971, Forest City submitted revised building plans for Parmatown Woods to Parma officials. The plans were given to Russell Reinke, the City Engineer, for his review and criticism (Reinke dep. 113). Reinke began to review the Parmatown Woods plans but stopped when he came across a problem with the street on which the proposed development was to be built: a street had not been dedicated to the City and accepted by the City Council as required by the Planning and Zoning Code (Tr. 1254–1255; Reinke dep. 114–115). It is Reinke's normal procedure to stop reviewing any plans as soon as he comes across a major deficiency. In the Parmatown Woods plans, that major deficiency was the lack of a street dedication and acceptance (*id.*). After his review of the plans stopped, Reinke returned the plans to the Building Commissioner and informed him that he could not proceed with the engineering review because of the street dedication problem (Gov. Ex. 56; Tr. 1218, 1342). On the next day, October 7, 1971, the Building Commissioner notified Forest City of the street dedication problem and of the fact that processing of the Parmatown Woods proposal could not be completed

48. Communications between HUD and Forest City in the summer and fall of 1971 showed that on June 10, 1971 the architectural exhibits were not acceptable for feasibility processing because there were some problems regarding certain aspects of the access road (Def. Ex. L). On July 16, 1971 a cost calculation discrepancy was discovered and the plans did not show any covered parking spaces (Def. Ex. P).

(Gov. Ex. 63; Tr. 1219; Vittardi dep. 63–65).

Forest City resubmitted applications for building permits for Parmatown Woods on October 26, 1971. With the exception of a change from 201 to 202 units in each building, the applications were identical to the ones submitted by Forest City on July 30, 1971 (Gov. Ex. 57, 58). The second set of plans was given to the City Engineer to review (Tr. 1219–1221). It was during this review that the Engineer, Mr. Reinke, departed from his normal plan review procedure (Tr. 1256–1257). Apparently not satisfied that the street dedication problem was sufficient grounds for rejection of the proposal, Mr. Reinke conducted a far more detailed review of the plans and uncovered several problems with the parking specifications (Reinke dep. 114, 117–118; Tr. 1220–1221; Gov. Ex. 67).

On October 28, 1971, Reinke again returned the Parmatown Woods plans to the Building Commissioner, notified him of deficiencies in the plans, and recommended that the plans be rejected and returned to the developer along with the building permit application (Tr. 1220–1221; Reinke dep. 117–118; Gov. Ex. 67). On November 3, 1971, the Building Commissioner did just that (Gov. Ex. 70; Tr. 1223; Vittardi dep. 63). After its second set of plans was rejected by Parma, Forest City ceased submitting revisions (Reinke dep. 175), and there was no further communication between Forest City and Parma concerning Parmatown Woods (Tr. 1222, 1346; Reinke dep. 175).

Parma contends that the decision to reject the Parmatown Woods proposal was made in accordance with normal procedures and regulations. Parma thus claims that the building permits would have been denied even if the intense opposition to the housing development on racial grounds had not been present. The Court finds otherwise because Parma officials, reacting to racial considerations, departed from their normal practices in determining to reject the Parmatown Woods building permit application.

The testimony of Messrs. Reinke and Vittardi reveal a system where, in the words of Mr. Reinke, things are done both "sometimes formally [and] sometimes informally" (Reinke dep. 111). Building permits, for example, were denied orally as well as in writing (Vittardi dep. 54). If building plans were acceptable, the applicant also was notified either verbally or in writing (Vittardi dep. 37). Daily contact with developers was carried out on an informal basis with no set routine to be followed (Vittardi dep. 45; Reinke dep. 189–190). At times, Parma initiated these contacts with developers and, at other times, developers called the City (Reinke dep. 106–107, 189–190; Vittardi dep. 45, 113). Parma's treatment of projects like the Regency Towers, Midtown Apartments, Parmatown Towers and Parmatown Gardens is further evidence that the City did not strictly adhere to formal procedures and regulations. Instead, a "spirit of cooperation" (Reinke dep. 123) existed between the City's building department and the local developers.

Against this background of informality and cooperation, the manner in which the Parmatown Woods proposal was handled was an aberration. Certainly Forest City's submission of incomplete plans was not a rare occurrence. Incomplete plans had been submitted for practically every apartment development in Parma, and officials had permitted revisions to be made (Vittardi dep. 43). In the case of Parmatown Woods, however, no officials of the Building Department bothered to contact Forest City about problems with the plans or to see if the problems could be worked out informally. In the past, Mr. Reinke had called Forest City when problems had arisen with one of its developments (Reinke dep. 44), and he knew many persons at Forest City (*id.* at 43). Jerry Vittardi also had previously contacted Forest City personnel on many occasions (Vittardi dep. 47–48). Reinke even had gone to the Forest City offices for a conference on at least one occasion, and he had meetings with Forest City officials in his office ten or more times (Reinke dep. 45). These facts lead the Court to find

totally incredible Mr. Reinke's testimony that he did not consider calling Forest City after he had rejected the Parmatown Woods plans for a second time because he "didn't know who to contact" (*id.* at 111–112).

This does not mean that there were not problems with the plans that were submitted to the City. But instead of trying to work the problems out informally, or taking other actions to accommodate the developer, Parma officials simply seized on the problems and rejected the proposal outright. This action is totally inconsistent with other instances that have been noted where building permits were issued for high-rise apartments before complete plans had been submitted or approved by city officials. *See* pp. 1074–1077, *supra.* Indeed, it would be difficult to imagine a more clear-cut case of disparate treatment than the denial of the building permits for Parmatown Woods on the one hand, and the granting of a building permit for Parmatown Towers on the other. Each incident occurred in 1971, and each involved the same developer. And, in each case, the streets on which the projects were to front had not been dedicated and accepted. Despite the similarities, the necessary building permit was issued for Parmatown Towers and was denied for Parmatown Woods. The distinguishing factor between the

projects is that Parmatown Woods was not a "luxury" development, and consequently its construction might have been enabled blacks to come into Parma.

The City of Parma argues that Russell Reinke, the City Engineer, and Jerry Vittardi, the Building Commissioner, are merely mechanical processors of building permit applications. It is claimed that their function in the building review process consists of strictly adhering to written guidelines, and that they have no authority to modify any of the requirements of the ordinances of Parma.[49] But this line of argument disregards the informal nature of the reviewing process, ignores the discretion vested with Parma officials to work out accommodations with developers, and is totally inconsistent with the facts presented to the Court.

### 4. The Effects of the Rejection

In 1972, after its proposal for Parmatown Woods was rejected by Parma, Forest City contacted HUD and succeeded in building a Section 236 project in adjacent Parma Heights (Tr. 296; Def. Ex. BA). Called Independence Place, this new apartment complex is basically the same project that was rejected by Parma and is located approximately 100 yards from the proposed Parmatown Woods site (Tr. 602, 617–618, 1418–1419).[50] There are presently no black

---

**49.** At trial, Parma claimed that the Parmatown Woods plans submitted by Forest City were not in conformity with three sections of the Planning and Zoning Code: § 1101.06(d), which provided that no building permit be issued by the Building Commissioner until the adjoining street had been dedicated and accepted; § 1197.03, which specified that for a building such as Parmatown Woods there be a minimum of three-quarters of a parking space per unit in an enclosed garage as part of the main building and which required that multi-family buildings provide for 2½ parking spaces per unit; and § 1163, which provided that no property zoned for non-residential use should be used for residential purposes. The alleged non-conformity with the requirements of § 1163 appears to be a reason advanced solely for trial purposes. This post-hoc rationalization of Parma's actions was never communicated to Forest City (*see* Gov. Ex. 70). Similarly, Parma did not rely, until trial, on non-conformity with

the provision of § 1197.03 requiring 2½ parking spaces per unit. Forest City officials had indicated at the time they presented Parmatown Woods to the Planning Commission that they would seek a variance (Gov. Ex. 59), and Parma officials fully expected such a variance to be sought (Tr. 1345). It is inconceivable that a major housing project would be rejected on account of non-compliance with parking requirements if the City, in good faith, expected a variance to be requested and intended to grant it. Finally, the treatment accorded Parmatown Towers indicates that the requirements of § 1101.06(a) for a dedicated and accepted street were flexibly applied by Parma officials.

**50.** Parma defends its conduct in rejecting the Parmatown Woods proposal by stressing that the record contains no evidence regarding Forest City's reasons for transferring the basic proposal from Parma to Parma Heights. The fact that Independence Place was built only 100

residents of Independence Place (Tr. 313–314, 1423; Def. Ex. AX, AY). As a result, Parma contends that there would have been no blacks living in Parmatown Woods either, and therefore that the rejection of the project had no segregative effect.

■ The lack of blacks in Independence Place can be attributed to several factors. One factor which may have affected black occupancy at Independence Place was the manner in which the Affirmative Marketing Plan was implemented by Forest City for that building.[51] HUD requires Affirmative Marketing Plans for all Section 236 projects where the project is to be located outside of areas of minority concentration. This is done in order to attract minority families from nearby metropolitan areas (Tr. 316, 292). An Affirmative Marketing Plan was in effect for Independence Place although the extent of this plan is not shown in the record (Tr. 297, 1422–1423). The record does show that Forest City had come under criticism by HUD for its Affirmative Marketing Plans and its method of carrying them out at approximately the same time that the Parmatown Woods and Independence Place proposals were being considered (Tr. 286; Def. Ex. AJ).

At one point, HUD criticized Forest City for not complying with HUD affirmative marketing guidelines and regulations and for not meeting equal opportunity goals (Def. Ex. AJ). Because HUD judges affirmative marketing plans in terms of efforts instead of results (Tr. 285), it must be assumed that HUD's criticism of Forest City occurred as a result of a lack of effort on the part of Forest City in carrying out its affirmative marketing obligations. In light of this, the Court finds that the lack of blacks at Independence Place is due in part to a lack of effort by Forest City in attempting to attract minority tenants to the Parma Heights project.

A second factor affecting minority occupancy at Independence Place is Parma's racially exclusionary image as an all-white city hostile to blacks and those who might bring blacks to Parma. Paul Cassidy, who has been the Mayor of Parma Heights for the past 22 years (Tr. 1410), testified at trial about the confusion that exists in Cuyahoga County as to the difference between Parma and Parma Heights (Tr. 1427–1428). The extent of this confusion was made clear to him during his 1968 campaign for Commissioner of Cuyahoga County. During the campaign, Cassidy spoke to many groups of blacks, and even though he would be introduced at these meetings as being from Parma Heights, people thought that he was from Parma. This was made clear to Mayor Cassidy because he repeatedly was questioned about the positions which Parma had taken (Tr. 1427–1429). From blacks especially, he learned that Parma had a reputation as being anti-black (Tr. 1428). On more than one occasion he was accused of being racially-biased because those making the accusations thought he was from Parma (Tr. 1429).

yards from the site initially proposed in Parma supports only one explanation. Forest City concluded that the project could not be constructed in the City of Parma. Forest City, a major developer in Parma, was obviously aware of the intense racial opposition to Parmatown Woods, see pp. 1077–1082, supra, and the impossible restrictions which the Parma Planning Commission had imposed on construction of the project. See p. 1080, supra. Forest City could not have ignored the significance of the timing of the rejection of the Parmatown Woods plans only one day after a general election in which two ordinances were enacted which destroyed any hope of constructing Parmatown Woods in Parma. See pp. 1086–1089, infra.

51. Parma relies on Forest City's Affirmative Marketing Plan for Parmatown Woods to show that the rejection of Parmatown Woods had no discriminatory effect. The Plan stated partly that "[i]t is expected that only a small number of minority people will be interested in living in the proposed project. The majority of tenants are expected to be from the ethnic groups who are prominent in the project area at this time." (Def. Ex. A). The Affirmative Action Plan nowhere speaks of the complete absence of blacks. In addition, HUD was critical of Forest City's effort under the plan. Finally, Parma's racially exclusionary image, see pp. 1065–1066, supra, may account for the low expected numbers of minorities.

Blacks have not moved to Independence Place since they, like other groups, are reluctant to move into an area where they sense that the neighborhood is hostile to them and that they will not feel welcome. Given the confusion existing among blacks as to the difference between Parma and Parma Heights, the fact that Parma's actions concerning Parmatown Woods were publicized so highly, and the fact that Parma's reputation for hostility to blacks was well known, it is not surprising that blacks decided not to live in Independence Place.

A final factor contributing to the absence of blacks at Independence Place was the refusal of Parma Heights to allow those living in the building to get federal rent supplements (Tr. 1419; Def. Ex. AD). A Section 236 project with rent supplements normally attracts a larger proportion of low-income persons than a normal Section 236 project because the rent supplement income levels are the same as those required for public housing eligibility (Tr. 566–567). At the time the Parmatown Woods and Independence Place proposals were submitted by Forest City, Section 236 projects were encouraged to have 20% rent supplements (Tr. 602). If Parmatown Woods had been built in Parma and rent supplements were utilized, it is likely that some low-income minority persons would have become tenants there. While the Court cannot conclude that any specified number of blacks would have resided in Parmatown Woods if it had been constructed, it is convinced that the denial of the building permits eliminated even the possibility of affordable housing for many low-income minorities, and thereby served to strengthen Parma's already strong racially exclusionary image.

### D. PARMA'S LAND–USE ORDINANCES

#### 1. *The Height and Voter Approval of Low-Income Housing Ordinances*

The rejection of Parmatown Woods on November 3, 1971, occurred only one day after a general election in which the electorate voted upon two issues which had grown out of the months-long opposition to that low-income housing project. On November 2, 1971, the voters of Parma enacted two ordinances which appeared on the general election ballot by initiative petitions. One ordinance, General Building Regulations § 1529.37 (Gov. Ex. 68) limits the height of all future residential structures to 35 feet. The other Building Code § 1528 (Gov. Ex. 69), requires approval by the Parma electorate of (1) the development, construction or acquisition in any manner of a subsidized housing project by a public body, or (2) any participation by private individuals or non-public bodies in any program in which the Federal Government pays all or part of the rent of low-income families.

Parma contends that the enactment of these ordinances occurred due to non-racial opposition by Parma residents to high-rise apartments and the possibility that federally-subsidized housing units might be built in the City. While numerous non-racial factors influenced the passage of the ordinances, the Court finds that the fear that blacks would move into Parma was an important motivation.

Opposition to the high-rise zoning classification existed at the time the classification was created in 1963 (Tr. 1177–1178, 1319; Kopchak dep. 88), and continued to exist until passage of the 1971 ordinance. Parma argues that there were several non-racial grounds on which residents objected to high-rise buildings over the years. Specifically, high-rise buildings were mentioned as being fire hazards (Tr. 1273; Kopchak dep. 183), creating traffic congestion (Kopchak dep. 31), causing ecological and aesthetic damage (Dunning dep. 38; Kopchak dep. 31), and overloading sewage facilities (Tr. 1270–1271). While the Court believes that there were Parma residents who sincerely opposed high-rise apartments for these reasons, there is no evidence in the record that any of the above problems actually existed. Additionally, persuasive evidence indicates that racial considerations contributed decisively to passage of the ordinances.

Regarding the belief that high-rise apartment buildings would constitute a fire hazard, the evidence indicates that such buildings are not inherently more unsafe than low-rise buildings (Reinke dep. 153–54). In any event, Parma does have fire equipment capable of handling emergencies in high-rise buildings (Kopchak dep. 181). The fact that Parma officials did not inquire about the fire hazards of high-rises (Petruska dep. 230; Dunning dep. 35, 56–58; Smallwood dep. 69, 75–77), even when the ten-story Parmatown Towers was constructed, seriously undercuts the weight to be accorded to the expressed concern.

The City of Parma also argues that high-rise apartments located in the area proposed for Parmatown Woods would have caused traffic congestion problems. No evidence was introduced by the City, however, to show that congestion would have occurred if Parmatown Woods had been built. Indeed, no study was done by Parma to show how construction of the project would have affected the flow of traffic in the area (Reinke dep. 151–152).

Parma also contends that the sewer system in the Parmatown Towers-Parmatown Woods area was inadequate to handle the increased demands that would have existed had Parmatown Woods been constructed (Tr. 1270–1271). The evidence indicates, however, that no one ever asked the City Engineer, Mr. Reinke, who has responsibility for the sewers (Reinke dep. 134), to study any possible sewer problem, and he never did so independently (Reinke dep. 147–148; Dunning dep. 37–38). In fact, the record shows that the construction of additional apartments in the Parmatown Towers-Par-matown Woods area would not have affected adversely the sewer system (Reinke dep. 139–140, 142–143).

Finally, Parma argues that construction of high-rise apartments in the Parmatown area would be aesthetically and ecologically harmful (Dunning dep. 38; Kopchak dep. 28). Again, no evidence was presented to indicate that such damage would have occurred had Parmatown Woods been built and no studies of possible damage were made (Kopchak dep. 31).[52]

The absence of evidence substantiating the objections to high-rise apartments, together with the fact that the initiative petitions for the ordinances were circulated at the same time Parmatown Woods was being considered and debated often in blatantly racial terms (Gov. Ex. 61), supports the finding that race discrimination was a motivating force behind passage of the ordinances. While three high-rise apartment buildings—Regency, Midtown and Parmatown Towers—were built in Parma during the time of this apparent opposition to high-rise buildings, only Parmatown Woods, a federally subsidized low-income housing project, was not built. There was no opposition whatever to the three former buildings on the basis of the anticipated race of their occupants, but this subject dominated the debate over Parmatown Woods.

Some of the same people who objected vehemently to Parmatown Woods were sponsors of the initiatives to impose height and voter approval limitations (Sands dep. 83–84). City officials and sponsors of the initiatives anticipated that, if passed, they would cover Parmatown Woods and any other low-income or federally subsidized

**52.** It is interesting to note that the aesthetic and ecological objections of Evelyn Kopchak, Parma City Councilwoman, to high-rise buildings in the area of Paramatown Woods (Kopchak dep. 28) apparently only went as far as the boundaries of the City of Parma. The land on which Parmatown Woods was to be constructed is in the Parma city ward which Ms. Kopchak represented when she was on the Parma City Council (*id.* at 60). After the Parmatown Woods proposal was rejected by the City of Parma in November of 1971, Forest City built basically the same project in Parma Heights called Independence Place (Tr. 602, 617–618). Independence Place was built only about 100 yards away from the site in Ms. Kopchak's ward where it had been proposed originally (Tr. 1418–1419; Petruska dep. 74). In spite of this, Kopchak did not express any objections, aesthetic or otherwise, to Parma Heights concerning the proposed construction of the Independence Place high-rise apartment complex (Kopchak dep. 165).

housing proposals (Tr. 1276–1277; Kopchak dep. 152–154; Dunning dep. 202).[53] Mayor Petruska, characterizing the future of Parmatown Woods as "speculation," urged Parma citizens to vote for the initiatives because "I am completely opposed to any type of public or low-income housing in the city of Parma" (Gov. Ex. 75, p. 2).

The Court already has found that racial discrimination was an important motivating factor in the opposition to Parmatown Woods in particular, and to public and low-income housing in general. Passage of the height and voter approval of low-income housing ordinances was part of this opposition, and racial discrimination again played a decisive role.

As a practical matter, the height and voter approval ordinances make the construction of any public or low-income housing very difficult. The 35-foot-height limitation makes the construction of federally subsidized low-income housing economically impractical (Tr. 795–798). Land available for multi-family apartments is generally far too expensive to support low and moderate-income family housing. For this reason most developers try to use federal programs like Section 236 to build high-rise buildings which serve both families and the elderly (Tr. 796). The rent structure which is available under government housing programs does not make it economically feasible to construct low-rise low-income housing in Parma (Tr. 797).

The low-income housing voter approval ordinance, Building Code § 1528, is another formidable obstacle to the development of low-income housing. The language of the ordinance is so all-inclusive that it appears to require voter approval for the development of any type of subsidized low-income housing by a public body or housing authority, and for the participation by private persons in any federal program which subsidizes rent. This ordinance even appears to encompass Section 8 housing, which is the main subsidy program administered by HUD at the present time (Tr. 554).[54] Thus, on its face the voter approval ordinance requires any prospective developer of low-income federally subsidized housing to face an uncertain referendum after undergoing the time and expense of obtaining land and having its plans approved by Parma officials.

The deterrent effects of Parma's height and low-income housing voter approval ordinance were magnified even further by the events surrounding their adoption. Developers of federally-subsidized housing were aware of the fate of Parmatown Woods and

---

**53.** Parma argues that Parmatown Woods would not have been affected by these ordinances because (1) the application for that project was pending at the time of their passage, and (2) only those ordinances in effect at the time the application was filed would apply to that application. The Court is not persuaded by this. On November 3, 1971, Forest City's plans for Parmatown Woods were "rejected" and the entire building permit application was returned to Forest City (Gov. Ex. 70). At that point, the Parmatown Woods application was no longer pending. A new application would have had to have been submitted by Forest City in order for Parma to again consider the proposal. Any submission by Forest City after November 3, 1971 would have occurred while these ordinances were in effect and there is no reason to believe that a new application would not have to comply with all laws then in effect in Parma. This is consistent with the testimony of John Sands, former Parma City Councilman and Assistant to the Mayor, who stated that as long as a building permit application meets the zoning code, an ordinance taking effect while the application was pending would not affect it (Sands dep. 52). This is also consistent with the trial testimony of Andrew Boyko, Parma Law Director, who testified concerning Parma's actions with regard to the Midtown Apartments in 1969 (Gov. Ex. 72, 73). Boyko at that time issued an opinion that a newly enacted ordinance in Parma would not affect a building permit application for Midtown which had been filed prior to the effective date of the ordinance. The Midtown application, however, had not been rejected and returned to the developer. In fact, construction on two of the three Midtown buildings had been approved, and the approval for the third building was only "withheld" with no rejection (Tr. 1166–1168; Gov. Ex. 72, 73).

**54.** The Court notes that forty-eight residents of Parma currently participate in Section 8 housing, and no evidence exists that voter approval has been sought.

of the statements of Parma officials that blacks are not welcome in Parma (Tr. 795). The low-income housing voter approval and height ordinances were other unmistakable signals to developers of a climate of prejudice against any government-subsidized housing (Tr. 791–792). For these reasons, developers concluded that it would be a waste of time and resources to acquire land and make proposals for low-income housing. Given the open attitude of hostility to blacks and federally subsidized housing in Parma, developers concluded that the proposals would either be blocked by the height requirement or meet certain defeat in the polls (Tr. 792).

The actual effect of the height and low-income housing voter approval ordinances has been devastating.[55] Since these ordinances were passed, no residential construction in Parma has exceeded 35 feet; no one has proposed or requested a variance to construct a higher residential building (Tr. 1251–1252; Vittardi dep. 120; Reinke dep. 198); no federally subsidized housing has been built in Parma; and not a single proposal for such housing been submitted (Tr. 1252, 1392, 573; Reinke dep. 201; Dunning dep. 177; Smallwood dep. 124).

### 2. *The Parking and Zoning Change Ordinances*

The government contends that two other Parma ordinances have a racially exclusionary effect and therefore violate the Fair Housing Act. One of the ordinances, Planning and Zoning Code § 1197.03, requires 2½ parking spaces per dwelling unit; the other, Building Code, § 1229.01, requires voter approval for any change in the zoning code or in existing land uses. The record does not show that either of these ordinances was passed for the purpose of excluding minorities. Yet the effect of both ordinances is to make the construction of low-income housing substantially more difficult and thereby preserve the all-white character of the City.

The requirement of 2½ parking spaces per dwelling unit for apartment buildings is the highest parking requirement in the City for residential structures (Tr. 1242–1243). Only one parking space per unit is required for one and two-family homes, and only four-fifths of a space per unit is required for hotels and rooming and lodging houses. Planning and Zoning Code § 1197.02(b). Even condominium developments, which are also multi-family housing, are required to have only two parking spaces per unit. Planning and Zoning Code § 1159.07(b).

Parma has offered no explanation as to why it requires 2½ spaces per apartment unit.[56] It is clear that Parma's 2½ space requirement is abnormally large compared to the parking requirements of other jurisdictions in the area (Tr. 564).[57] Parma's parking requirement also contrasts sharply with the HUD guidelines of one space per unit for Section 236 housing (Tr. 562, 620) and of one space per two units for senior citizen housing (Tr. 619).

The effect of Parma's 2½ parking space requirement has been to inhibit the construction of low-income housing in Parma.

---

**55.** Parma seeks to contest the effect of these ordinances by noting that there is no evidence in the record of any proposed projects for low and moderate income families which were deemed to be impossible to build because of passage of the ordinances. This ignores the crucial fact that because the ordinances effectively preclude the construction of federally subsidized housing, no developer would waste money formulating an uneconomical proposal. Of course, the Parmatown Woods proposal was rejected the day after the ordinances were enacted.

**56.** Typical apartments, even luxury ones, in the Cleveland area are occupied by families need-

ing no more than two cars. The pattern in the Cleveland area is for families or for persons with enough income to own two cars to buy homes and not to live in apartments (Tr. 803).

**57.** One HUD official could not recall HUD'S ever allowing more than one and a half spaces per unit of multi-family housing in the ten years he worked in that field (Tr. 620). Another witness with extensive housing experience stated that in the areas in which he had worked 1½ spaces per unit was the highest number of required spaces which he had encountered for multi-family housing; for senior citizen housing, the number could be cut in half (Tr. 801–802).

Because a higher parking space requirement requires a developer to use more land for an apartment development (Tr. 801, 565–566), it reduces the practicality of dense development (Tr. 801) and makes it less feasible for a developer to construct a housing project under low or moderate-income HUD programs (Tr. 566). Rigid enforcement of the 2½ parking space requirement is one of the ways in which Parma has been able to keep all low-income housing out of the community (Tr. 815).[58]

On November 5, 1974, voters of Parma enacted an ordinance which requires voter approval of any change in existing land uses or land use ordinances. Building Code § 1229.01 (Gov. Ex. 87). Under this ordinance, any developer needing a zoning or land-use change to construct low-income multi-family housing is now required to get approval for the change from the Parma voters.

In light of the open hostility which residents of Parma have displayed toward low-income housing in the past, a developer would be extremely reluctant to propose a low-income housing project that would require a zoning change. In fact, no developer has submitted a request for a zoning change to build a multi-family dwelling since the ordinance was enacted (Petruska dep. 286). Significantly, there has been a decrease in residential construction and in building permit applications for residential construction in Parma since the enactment of this ordinance (Vittardi dep. 114–115).

With the passage of this voter approval of zoning changes ordinance, a developer who wants to construct low-income federally subsidized housing is faced with a Herculean task. First, he has to secure voter approval of his low-income proposal, and face the costly delay inherent in that process. Then, in the unlikely event that he is successful, he will have to face the voters again if a zoning change is necessary to build the project. In any event, he will then be confronted with the prospect of constructing an economically infeasible complex, given the 35-foot-height limitation and the requirement of 2½ parking spaces per dwelling unit from which a variance has never been granted since 1971. In effect, what the 1974 zoning ordinance did to low-income housing was to "add a more difficult hurdle to the already impossible one" (Tr. 799).

The cumulative effect of the four ordinances enacted by Parma is to prevent construction of any low-income housing in the City. Developers will not even attempt to bring low-income public housing proposals to the City, where it is clear that at best they will receive no cooperation from Parma officials, and at worst they will encounter deep-rooted resistance (Tr. 811).[59] This is not to suggest, however, that apartment construction has ceased in Parma since passage of the ordinances. Multi-family housing has been constructed since November 1971 (Tr. 1243), but none of it has been low-income or federally subsidized housing (Tr. 1252, 573).[60]

---

58. Parma has made a point of showing that its neighbor, Parma Heights, also has a 2½ parking space per unit requirement for multi-family dwellings (Tr. 1420). There is, however, one significant difference: Parma Heights routinely grants variances to this requirement (Tr. 1430) and in fact granted a variance down to 0.84 spaces per unit to Forest City for Independence Place (Tr. 1421). Since 1971, Parma has not granted a variance to its 2½ parking space requirement (Tr. 1259, 1262).

59. One Section 236 developer with extensive experience indicated that the awareness of community resistance influenced the decision not to build in Parma. "The judgment not to come to Parma was based on the attitude that we thought was expressed in the initiative peti-

tion to pass these ordinances rather than the specific ordinance." (Tr. 815).

60. At least three apartment complexes have been built since 1971. Parmatown Gardens a garden apartment by Forest City (Tr. 1244–1245, 1251), which is about 28 feet high (Tr. 1250) and stands on part of the land originally proposed for Parmatown Woods (Tr. 1210; Def. Ex. DJ). The Sandpiper development is a condominium development about 25 feet high (Tr. 1244, 1250–1251; Vittardi dep. 117–118). The most recent multi-family project constructed in Parma, the Kimberly Park Apartments (Tr. 1244, 1251; Reinke dep. 193–194), consists of luxury apartments, is about 35 feet high, and has tennis courts and a swimming pool (Gov. Ex. 121; Tr. 1248–1249).

## E. THE COMMUNITY DEVELOPMENT BLOCK GRANT APPLICATION

The government's final contention is that Parma's conduct in applying for Community Development Block Grant funds was motivated by racial considerations and had the effect of preserving a segregated community. Title I of the Housing and Community Development Act of 1974, known as the Community Development Block Grant Program, 42 U.S.C. § 5301 *et seq.*, is designed to bring federal funds for housing and community development to local governments (Tr. 713–714). Its purpose is to provide funds for the improvement of the urban environment, the development of the inner city and the deconcentration of low-income households (*id.*).

Decisions regarding how these funds are to be utilized are made by local public officials and interested citizens. However, one of the requirements imposed by the federal government for a community's participation in the program is that provisions be included regarding the housing needs of lower income families (Tr. 716). In order to insure that the requirement is met, a community must submit a Housing Assistance Plan which sets forth the community's proposals for meeting the needs of lower income families within its political jurisdiction and for providing housing for those "expected to reside" in the community (Tr. 716).[61]

In late 1974, Mayor John Petruska proposed that Parma apply for Community Development Block Grant (CDBG) funds after he had received information about the creation of the CDBG program from the federal government (Tr. 1349; Petruska dep. 302). A decision was made to apply for CDBG funds and the Regional Planning Commission was requested by Parma to assist the City in the preparation of its application (Tr. 1349). Pursuant to the requirements for the CDBG program, several public meetings were scheduled by the City to get citizen input on Parma's participation in the program (Tr. 756, 1350), and notices were sent to the various media in the Cleveland area advertising these meetings (Gov. Ex. 88; Def. Ex. CQ, CS, CT, CU, CV, CW). The City received many comments from Parma residents concerning how the CDBG funds could be used (Tr. 1350–1351; Gov. Ex. 89; Def. Ex. BG, DG). Some of the suggestions included the need for a new civic center, the preservation of an historic site, the improvement of a hockey rink, the enlargement of the Senior Citizens program, and a center for the treatment of emotional problems (Tr. 1402–1403; Def. Ex. CU, CW).

Following the meetings, Parma officials met with representatives of the Regional Planning Commission and discussed the CDBG application (Tr. 1351–1352, 1388). The discussion centered on the suggestions that had been made at the public meetings and the needs and goals which Parma would include in its application to HUD (Tr. 1351–1352, 1388). After this meeting, the Regional Planning Commission drafted Parma's application (Petruska dep. 303). The decision on what ultimately went into Parma's CDBG application was made by Mayor Petruska and the members of the Parma City Council (Petruska dep. 305).

In late February 1975, the Parma City Council approved submission of the plans (Gov. Ex. 92), and after certification that the project had the appropriate review (Def. Ex. BX), the application was submitted to HUD in April of 1975 (Gov. Ex. 96).

Parma's CDBG application was rejected by HUD because the City did not submit an adequate Housing Assistance Plan. This deficiency in the application, and Parma's adamant refusal to correct it, is further evidence of Parma's consistent opposition to low-income housing and to anything which might serve to alter the virtually all-white character of the City.

Table 15 of Parma's Housing Assistance Plan, submitted as part of its CDBG application, is entitled "Housing Assistance

---

**61.** "Expected to reside" refers to those persons who would be expected to come into a community in order to avail themselves of an opportunity to be close to their employment (Tr. 716).

Needs of Lower Income Households" (Petruska dep. Ex. 24). In this table, Parma was required to set forth the low-income housing needs of the City (Tr. 557). The number of Parma low-income households requiring housing assistance in 1975 was listed as 1,537 (Tr. 1381; Petruska dep. Ex. 24). Of this number, non-elderly needs were listed as 778 and elderly needs at 759 (*id.*). Despite having low-income housing needs of over 1500 households in 1975, Parma made no provision for meeting these needs in the first year of the CDBG program. More importantly, Parma made no provision for meeting its 778 non-elderly low-income housing needs at any time (Tr. 1382; Petruska dep. Ex. 24). In Table 16 of Parma's Housing Assistance Plan, entitled "Annual Goal for Housing Assistance," Parma wrote that its first year goal for assisting low-income households was *zero* (Tr. 1354, 1382; Petruska dep. Ex. 24). The number of additional low-income households expected to reside in the community also was listed as *zero* (Tr. 1388; Petruska dep. Ex. 24).

Parma's application was disapproved by the federal government because of the City's failure to provide low-income housing assistance goals. HUD found a zero figure under "Additional Households Expected to Reside" in Parma to be plainly inconsistent with generally available facts and data which indicated that additional lower-income households could be expected to reside in Parma as a result of existing employment opportunities there (Gov. Ex. 94, 97, 98, 100, 101, 103, 104). Readily available data from the 1970 United States Census indicated that 5,843 low-income persons resided outside of Parma and worked in the City (Gov. Ex. 94). In addition, HUD found Parma's "zero" goal for housing assistance to be totally at odds with its stated low-income housing need of 1537 households (*id.*). HUD officials advised the City of Parma that its CDBG application was deficient in these two respects and that the application would be denied if those deficiencies were not corrected (Gov. Ex. 98). Parma chose not to revise its application for CDBG funds

(Petruska dep. 317–318), and the application was finally rejected by HUD on June 27, 1975 (Gov. Ex. 104).

Parma has advanced three non-racial reasons to explain why the inadequate Housing Assistance Plan was submitted with the CDBG application. First, Mayor Petruska claims that the City was not sure of the accuracy of the census figures used by the Regional Planning Commission in preparation of the application and had to verify these figures through various studies before proceeding further (Tr. 1384–1385). Yet Mayor Petruska personally certified the accuracy of everything in the application (Tr. 1390), and Parma relied on census data throughout the application. No fewer than 11 of the 16 tables in Parma's CDBG application utilized figures from the 1970 Census, concerning such things as age of housing, condition of housing, income of families, and number of elderly residents. Census figures showing the need for assistance to low-income elderly households in Parma apparently were considered accurate enough by Parma to warrant proposing senior citizen housing in its application (*See* Table 16, 2 pages before Table 15 of Parma's CDBG application, Petruska dep. Ex. 24). So were the the figures in Table 15 which indicated a low-income housing need.

Parma decided to reject only those census figures which indicated a need for low-income housing. However, the City has advanced no explanation as to why there should be selective inaccuracy in the published census data it chose to utilize. In the absence of such an explanation, this Court is not persuaded that Parma was actually or reasonably concerned about inaccurate data. Rather, the clear inference is that Parma was opposed to the construction of low-income housing not limited exclusively to Parma's elderly residents.

The second explanation advanced by Parma to justify its decision to exclude plans for low-income housing assistance in the CDBG application is that the application itself specified that a certain amount of dollars was to be used to conduct a study of

the low-income housing needs of the community (Tr. 1354–1355, 1385). However, the only provision in Parma's application concerning a study of housing needs appears in Part C of Table 16 of Parma's Housing Assistance Plan (Petruska dep. Ex. 24). In Table 16, the City proposes to rehabilitate apartments for senior citizens in the fifth and sixth years of its community development program and to start "engineering studies" in the third year of the program. Nowhere else in Parma's application is there any mention of further study of housing needs. It is questionable whether the "engineering studies" contemplated in the plan would involve an evaluation of the housing needs of Parma. In any case, it is clear that these proposed studies refer only to senior citizen housing. The Court finds that Parma's CDBG application nowhere addresses Parma's stated low-income housing need of 778 non-elderly households; nor does it propose further study of such a need.

Parma's third reason for submitting an inadequate plan is that its "zero" goal of housing assistance for low-income households reflects community needs as expressed by the Parma public at public hearings. The City claims that low-income housing was not indicated as being such a need (Tr. 1388, 1390). However, the notices of proposed CDBG public meetings which were prepared by Parma officials never mentioned that housing of any kind was to be a topic of discussion (Def. Ex. CS, CT, CU, CV, CW; Gov. Ex. 88, 91; Tr. 1389–1390). While the need for low-income housing was noticeably omitted as a topic of discussion, numerous other topics were specified, such as construction of a civic center and improvement of hockey facilities. In the absence of notice that low-income housing needs would be discussed, it is not surprising that the community did not indicate the existence of such needs at the CDBG hearings. The Court rejects Parma's contention that the lack of an expressed need for low-income housing at two public hearings means that no such need existed. The evidence amply indicates that there was a definite need for low-income housing in Parma.

The three reasons advanced by Parma to justify its Housing Assistance Plan are insufficient to account for the actions undertaken. Even if credible, they do not explain the City's refusal to revise the CDBG application once HUD's objections became known. The evidence reveals that the real explanation behind Parma's action in the CBDG application was a deep abhorrence of low-income housing because it might enable "outsiders" to reside in the City.

During the period of time in late 1974–early 1975, when a possible application by Parma for CDBG funds was being discussed, suggestions from citizens on the possible use of such funds were received by the City (Tr. 1350–1351). In a January 13, 1975 letter enclosing such suggestions, it was revealed that some opposition to participation in the CDBG program had surfaced because of a fear that the program "was a devious plot to slip low-cost housing into Parma through the back door" (Gov. Ex. 89). That this was not just an isolated occurrence and was made clear a month later, when on February 27, 1975, a Special Meeting of the Parma City Council was held to discuss the proposed application of the City of Parma for CDBG funds (Gov. Ex. 92). After discussion on the merits of the application, a Council vote was held on whether or not to permit the City to apply for the funds. The vote was in favor of the application, but a further concern over what Parma was getting itself into by applying for the funds was voiced by one of the Parma City Councilmen, Gerald Boldt, at the meeting. Boldt voted against the application because he felt that Parma, through its CDBG application, was "getting involved in an area where we are seeking Federal subsidies in low-income housing" (id. at p. 4). Although other Council members expressed some concern over the possibility of a "string" being attached to receipt of CDBG funds, a majority of the Council apparently was assured that this was not the case by Mayor Petruska, who stated

that he would not advocate consideration of the program if he didn't believe in what he had publicly stated the program stood for. Accordingly, the Council approved the application (Gov. Ex. 89).

What Mayor Petruska apparently thought the CDBG program stood for, and what the City Council voted for on February 27, 1975, was for the right of Parma to receive federal funds while ignoring its stated low-income housing needs and the needs of those low-income persons who might want to live in Parma (Tr. 1356; Gov. Ex. 99). In a letter to HUD dated May 14, 1975 (Gov. Ex. 99), Mayor Petruska wrote about the City's need for senior citizen housing [62] and its opposition to HUD regulations which require that low-income needs be met in order for the CDBG application to be funded. In his letter, Mayor Petruska wrote in part:

> [W]e do not feel an obligation to provide for any others across this nation since they have their own choice of mobility, they have their own choices of where they care to reside, and it is their obligation to furnish for themselves a location for a residence. We in Parma will take care of those in Parma . . .

Mayor Petruska was not alone in his desire to avoid low-income housing and the opportunities such housing might provide to "outsiders." Parma's Congressman, Ronald Mottl, echoed Petruska's sentiments when he wrote to HUD Secretary Carla Hills about preserving the "character" of Parma (Def. Ex. BN).

There is little question that Parma's character—its all-white character—was highly valued by the residents of the City and by City officials. Construction of low-income housing was opposed because it meant the blacks might move into Parma. See pp. 1072–1074 supra. To maintain the City's all-white character, millions of dollars in federal funds were rejected by the citizens of the community and their elected officials. The effect of this rejection was to further insulate the community against low-income housing and increased opportunities for minority housing (Tr. 719).

The receipt of CDBG funds would have helped the City of Parma to provide an equal opportunity in housing for all races (Tr. 715). By rejecting the funds, Parma assured that it would continue to be an almost totally segregated community. The Court finds that Parma's submission of an inadequate CDBG application and its refusal to amend that application were intended to foreclose, and in fact have foreclosed, housing opportunities that would otherwise have been made available to all low-income persons, including blacks.

## IV. VIOLATIONS OF THE FAIR HOUSING ACT

 The government is authorized to bring this lawsuit under Section 813 of the Fair Housing Act, 42 U.S.C. § 3613.[63] Un-

---

**62.** In his letter, Petruska speaks of the "strong need" for senior citizen housing evidenced at public CDBG hearings (Gov. Ex. 99, p. 1). If such a strong need indeed was discussed at these hearings, it is peculiar that the defendant's notices of CDBG hearings, which set forth the subjects which had been brought out at a previous meeting, make no mention of this need (Def. Ex. CS, CT, CU, CV, CW; Gov. Ex. 88, 91).

**63.** Parma's contention that this action is time-barred by Section 812 of the Fair Housing Act, 42 U.S.C. § 3612, misconceives the relationship between Sections 812 and 813, as well as the nature of the government's pattern or practice case. The simple heading of Section 812—Enforcement by private persons—demonstrates the inapplicability of its statute of limitations to a suit by the Attorney General under Section 813. Additionally, the policies and practices challenged by the government can not be limited to a single incident occurring at a specific time. To establish a pattern or practice, the government must be able to challenge decisions which have been made over a period of time. The practical effect of accepting Parma's position would be to limit the Attorney General to patterns and practices which existed no longer than 180 days prior to the filing of a lawsuit. Such a position is clearly inconsistent with a broad construction of the Fair Housing Act. See Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

der Section 813, the Attorney General is permitted to sue when there is "reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by [the Act], or that any group of persons has been denied any of the rights granted by [the Act] and such denial raises an issue of general public importance." [64]

The government contends that the City of Parma violated the Fair Housing Act by both engaging in a pattern and practice of resistance to the full enjoyment of rights granted by the Act, and by denying rights granted by the Act to groups of persons. The rights granted by the Act which the government claims Parma has resisted or denied are specified in two separate sections: Sections 804(a) and 817, 42 U.S.C. §§ 3604(a) and 3617. Section 804(a) provides in part that "it shall be unlawful . . . to make unavailable or deny . . . a dwelling to any person because of race, color, religion, or national origin." Section 817 provides in part that "it shall be unlawful to . . . interfere with any person in the exercise or enjoyment of, . . . or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604 . . . of this title." It is the government's contention that Parma's persistent resistance to the construction of low-income housing in the City violates the provisions of both of these sections.

To demonstrate a pattern or practice of resistance to the enjoyment of the rights secured by Sections 804(a) and 817, the government must prove more than an isolated incident of unlawful discrimination. *United States v. Pelzer Realty Co.*, 484 F.2d 438, 445 (5th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286

(1974); *United States v. Reddoch*, 1 EOHC § 113,569 (S.D.Ala.1972), *aff'd*, 467 F.2d 897 (5th Cir. 1972). The unlawful discrimination, in other words, must have been a regular procedure followed by the defendant. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 360, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). This does not mean that the defendant must have engaged uniformly in unlawful acts, *United States v. Reddoch, supra; United States v. Real Estate Development Corp.*, 347 F.Supp. 776, 783 (N.D.Miss.1972), for it is clear that failures to act also may constitute violations of the Fair Housing Act. *Resident Advisory Board v. Rizzo*, 425 F.Supp. 987, 1018–1019 (E.D.Pa.1976), *aff'd*, 564 F.2d 126, 153 (3rd Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978). The existence of a discriminatory policy, statute, or ordinance is itself a discriminatory pattern or practice. *United States v. Hughes Memorial Home*, 396 F.Supp. 544, 551 (W.D.Va.1975); *see* 106 Cong.Rec. 7223 (Senator Keating). Additionally, the failure to eliminate a policy which prevents fair housing violates the Act. *Resident Advisory Board v. Rizzo*, 425 F.Supp. at 1018.

To demonstrate that a group of persons has been denied specific rights granted by the Act the government must show that the discriminatory conduct affects more than a single individual. Even an isolated act of discrimination against a group of persons is sufficient to support relief. *United States v. Hunter*, 459 F.2d 205, (4th Cir. 1972), *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972).

The Court, after considering the evidence in its entirety, is convinced that Parma engaged in a pattern and practice of resistance to the full enjoyment of the rights granted by Sections 804(a) and 817 of the Fair Housing Act by following a con-

---

**64.** The Attorney General's determinations of reasonable cause and general public importance are not reviewable by the courts. *United States v. Northside Realty Associates*, 474 F.2d 1164, 1168 (5th Cir. 1973); *id.* 501 F.2d 181 (5th Cir. 1974), *rehearing denied*, 518 F.2d 884 (5th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1483, 47 L.Ed.2d 747 (1976); *United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 125 (5th Cir. 1973), *cert. denied*, 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973).

sistent policy of making housing unavailable to black persons. The Court also finds that the City's actions denied the rights secured by Sections 804(a) and 817 to groups of persons. The Court's findings are based on both a standard of racially discriminatory intent and a standard of racially discriminatory effect. *See* pp. 1052–1055, *supra.* Under either standard, Parma's actions amounted to violations of provisions of the Fair Housing Act which forbid discrimination in housing on the basis of race.

The Court specifically finds that the rejection of the fair housing resolution, the consistent refusal to sign a cooperation agreement with CMHA, the adamant and long-standing opposition to any form of public or low-income housing, the denial of the building permit for Parmatown Woods, the passage of the 35-foot height restriction ordinance, the passage of the ordinance requiring voter approval for low-income housing, and the refusal to submit an adequate housing assistance plan in the Community Block Development Grant application, individually and collectively, were motivated by a racially discriminatory and exclusionary intent. The purpose of these actions, the Court finds, was to exclude blacks from residing in Parma and to maintain the segregated "character" of the City. These actions, individually and collectively, also violated the Fair Housing Act by denying to blacks, Parma residents, and prospective low-income housing developers rights secured by Sections 804(a) and 817.

This Court is well aware of the difficulty and danger of assessing and attributing motivations to actions undertaken by public officials and the electorate. And where the motive alleged is racial discrimination, which generally is exhibited in cloaked and subtle forms, the task is all the harder. *See Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971). In this case, however, the evidence of racially discriminatory intent is overwhelming. Public expressions of racial bias were not limited to certain residents of the City, but were made by the highest elected public officials. Ac-

tions were taken and decisions were made which are inexplicable in the absence of racial motivations. The evidence conclusively establishes that the City of Parma took a series of actions to prevent the construction of low-income housing and thereby preclude blacks from moving into the community.

The evidence shows, for example, that in defeating the proposed fair housing resolution and in blocking every effort to build public and low-income housing, the Mayor, City Council President and members of the Council stated publicly that they were opposed to blacks moving into the City of Parma. These elected officials were opposed to any action which could change the virtually all-white composition of Parma's neighborhoods. Their public statements clearly establish that they equated public and low-income housing with housing for blacks.

With the exception of the rejection of Parmatown Woods, these particular public officials were involved in all of the actions which prevented the construction of low-income housing. Even in the case of Parmatown Woods, the Building Commissioner and City Engineer who denied the building permit were appointed by Mayor Petruska and accountable to the City's leadership. The attitudes of the Mayor, the President of City Council, and members of the Council were known to these subordinate local officials. And as the Court has noted recently, the attitudes expressed by City leaders can "infect all administration personnel . ., and the obvious foreseeable consequence is that lower echelon decision makers would assume that the established, albeit informal, city policy was that it was proper" to practice racial discrimination. *Arnold v. Ray,* No. C 73–478 (N.D.Ohio, decided December 11, 1979), slip op. at 4–5 (Lambros, J.).

The direct evidence of racial intent in this case is well-documented and much more substantial than that involved in previous fair housing cases in which municipalities have been found to practice a deliberate policy of racial exclusion. *Compare, e. g.,*

*Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3rd Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978). Combined with the circumstantial evidence adduced at trial, it is beyond cavil that Parma has held and practiced a deliberate policy of racial exclusion.

The evidence shows that Parma's virtually all-white composition was created by pervasive acts of purposeful discrimination, and was preserved by a series of discriminatory actions taken by the City. Proposals for the construction of low-income housing projects which would have had an integrative effect on the community were objected to vehemently by many of Parma's residents on racial grounds. In other significant actions, namely the rejection of Parmatown Woods and the requirement of voter approval for federally subsidized housing, abrupt departures from normal procedures insured that racial minorities would not be able to find affordable housing in Parma.

These actions on the part of the City of Parma are evidence of a segregative intent. They had a segregative effect which was not only foreseeable, but actually foreseen. Every time Parma was confronted with a choice between decisions that would have had an integrative or segregative effect, Parma chose the latter. The City of Parma consistently has made decisions which have perpetuated and reinforced its image as a city where blacks are not welcome. This is the very essence of a pattern and practice of racial discrimination. *United States v. Youritan Constr. Co.*, 370 F.Supp. 643, 650–651 (N.D.Calif.1973), *aff'd in relevant part*, 509 F.2d 623 (9th Cir. 1975). *See also United States v. Real Estate Development Corp.*, 347 F.Supp. 776 (N.D.Miss.1972); *United States v. Hughes Memorial Home*, 396 F.Supp. 544 (W.D.Va.1975). *Cf. Greene v. City of Memphis*, 610 F.2d 395 (6th Cir. 1979), *cert. granted*, —— U.S. ——, 100 S.Ct. 2150, 64 L.Ed.2d 787 (1980).

Parma claims that all of the actions it took were lawful because they are within the ambit of legitimately derived municipal authority. The City's basic position is that it has absolute authority to decide whether it wishes to pass a fair housing resolution, permit or encourage low-income housing within its boundaries, participate in federal housing programs, or promulgate and enforce zoning laws. According to the City "[t]he bigoted comments of a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis." *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1292 (7th Cir. 1977) (*Arlington Heights II*).

■ The Court cannot accept the City of Parma's contention that racial discrimination can be a permissible "secondary" motivation for municipal actions if there are other legitimate bases for the actions. Such a contention is inconsistent with the great weight and wisdom of precedent which holds that a denial of housing violates Section 804(a) of the Fair Housing Act if race is even one of the motivating factors. *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1042 (2d Cir. 1979); *United States v. Pelzer Realty Co.*, 484 F.2d 438, 443 (5th Cir. 1973), *cert. denied* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344, 349–350 (7th Cir. 1970).

■ The Court is aware of no case in which a Fair Housing Act claim was rejected where it was established that race was a partial reason for the denial of housing. *See Robinson v. 12 Lofts Realty, Inc., supra* at 1042. Race is an impermissible factor in municipal low-income housing decisions which "cannot be brushed aside because it was neither the *sole* reason for discrimination nor the total factor of discrimination. [There is] no acceptable place in the law for partial racial discrimination." *Smith v. Sol D. Adler Realty Co., supra* at 349–350.

Parma's reliance on dicta from *Arlington Heights II* to justify its low-income housing decisions despite the blatant racial bias of some elected officials is unfounded. Neither the procedural history of the case nor

the context of the court's statement supports Parma's position that racial considerations can be a motivation for municipal decisions if other legitimate and primary motivations exist.

*Arlington Heights II* was decided by the Court of Appeals for the Seventh Circuit after being remanded by the Supreme Court in *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (*Arlington Heights I*). The case involved the refusal of Arlington Heights to rezone certain property to permit the construction of Section 236 low-income housing. The Supreme Court noted that the Court of Appeals, which reversed the District Court and held that discriminatory impact violated the Equal Protection Clause, had approved certain of the District Court's findings regarding discriminatory intent. Specifically, the Court of Appeals approved the finding that "the petitioners were not motivated by racial discrimination or intent to discriminate against low-income groups when they denied rezoning, but rather by a desire to protect property values and the integrity of the Village's zoning plan. [D.C.] 373 F.Supp. [208], at 211." *Arlington Heights I, supra* at 259, 97 S.Ct. at 560.

The Supreme Court, in reversing and remanding the case, held that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.* at 265, 97 S.Ct. at 563. Absent evidence of intent to discriminate, the Court of Appeals was limited to a consideration of the applicability and scope of the "racially discriminatory effects" standard for assessing Fair Housing Act violations. Thus, the *Arlington Heights II* court was addressing a situation in which evidence of intent, by itself, constituted an insufficient basis on which to grant relief. It was in this context that the court cautioned against the indiscriminate use of racial statements to demonstrate a violation of the Fair Housing Act.

In this case, the direct evidence of purposeful discrimination by the City of Parma against blacks is overwhelming. The situa-

tion is totally different from that in *Arlington Heights II* where "the absence of *any* such evidence . . . is a factor buttressing the Village's contention that relief should be denied." *Arlington Heights II, supra* at 1292.

Parma also erroneously relies on *Citizens Committee for Faraday Wood v. Lindsay*, 507 F.2d 1065 (2d Cir. 1974) to support its contention that the municipal decisions and actions which were taken in an atmosphere where racial considerations were present are not unlawful. *Faraday Wood* was an action seeking relief from New York City's decision not to proceed with a publicly financed housing project. The District Court, in dismissing the complaint, found that

"on the record in this case, the plaintiffs have not established that racial motives underlay the community opposition to this project; therefore, to the extent that the inaction . . . was a response to community concerns, no racially discriminatory motives can be imputed to it. That there was some racial opposition does not mean that opposition on other grounds was not the overriding community sentiment or the nature of the opposition to which the administration responded."

362 F.Supp. 651, 655 (S.D.N.Y.1973). In affirming the lower court, the Court of Appeals for the Second Circuit noted that while some community opposition to the housing project was based on racial considerations, the opposition "was not for the most part racially motivated." 507 F.2d at 1070. To the extent that *Faraday Wood* might be read as suggesting that racial discrimination may be a permissible secondary motivation for municipal action, this Court respectfully declines to embrace the reasoning of the Second Circuit.

An accurate analysis of *Faraday Wood* reveals that the court paid particular attention to evidence that the city officials who made the decision to terminate the housing project were not motivated by racial considerations. Unlike the present case, the Court in *Faraday Wood* noted that "in fact,

there was evidence that those officials were not motivated by such considerations and did not believe that the community opposition to the project was primarily racial in character." 507 F.2d at 1070 (footnote omitted).[65] Any doubt concerning the correct interpretation of *Faraday Wood* on the legality of "secondary" racial motivations was recently put to rest in *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1043 (2d Cir. 1979), where the Second Circuit held that race cannot play any role in a decision to deny housing in violation of Section 804(a) of the Fair Housing Act.

The City of Parma's claim that it did not violate the Fair Housing Act because it was acting within the ambit of legitimately derived authority is without factual or legal support. The record in the present case is replete with instances of community opposition to low-income housing based on racial grounds and with evidence that city officials responded to these racial considerations. Parma officials were acutely aware of race and their decisions were influenced decisively by this awareness.

■■■ The City of Parma cannot choose to make decisions on the basis of racial considerations. Actions which are typically lawful, such as a mandatory referendum on housing and zoning matters,[66] a locality's decision not to apply for federal assistance in housing,[67] and a community's refusal to promote low-income housing,[68] lose that character when they are undertaken for a discriminatory purpose. *See Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) (ordinance requiring voter referendum on racial housing matters held unlawful); *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) (power of citizenry to enact discriminatory laws via initiative referendum held unlawful); *Kennedy Park Homes Assn., Inc. v. City of Lackawanna*, 318 F.Supp. 669 (W.D.N.Y.), *aff'd*, 436 F.2d 108 (2d Cir. 1970), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971) (refusal to permit construction of low-income housing in white areas held unlawful). Because the evidence clearly demonstrates that Parma's actions were motivated by racial bigotry, there is a violation of Sections 804(a) and 817 of the Fair Housing Act.

The Court finds that the City of Parma violated the Fair Housing Act not only because it made decisions with the intent to discriminate, but also because its decisions have had significant discriminatory effects. Indeed, the racially discriminatory intent and racially discriminatory effects standards dovetail because Parma's overall intent to exclude black residents has brought about the desired result. The challenged actions have had the effect, individually and collectively, of excluding blacks from

---

**65.** The degree of scrutiny which the court applied in *Citizens Committee for Faraday Wood v. Lindsay*, 507 F.2d 1065 (2nd Cir. 1974) also distinguishes that case from the present one. Because *Faraday Wood* involved the termination of a primarily middle-income project, and there was no disproportionate representation of minorities in middle-income levels, the careful scrutiny traditionally applied in typical low-income public housing was not employed. *Id.* at 1068–1069.

**66.** *See James v. Valtierra*, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971); *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976); and *Ranjel v. City of Lansing*, 417 F.2d 321 (6th Cir. 1969), *cert. denied*, 397 U.S. 980, 90 S.Ct. 1105, 25 L.Ed.2d 390, *reh. denied*, 397 U.S. 1059, 90 S.Ct. 1352, 25 L.Ed.2d 680 (1970). These cases do not support Parma's contention that its ordinances, enacted pursuant to initiative referendums, do not violate the test of the Fair Hous-

ing Act. Unlike this case, the Court in *James v. Valtierra* noted that "the record here would not support any claim that a law seemingly neutral on its face is in fact aimed at a racial minority." 402 U.S. at 141, 91 S.Ct. at 1333. In *City of Eastlake v. Forest City Enterprises, Inc.*, supra, there is no evidence that the Court was ever confronted with any evidence indicating a denial of housing because of race. Finally, in *Ranjel v. City of Lansing*, supra, the Court of Appeals for the Sixth Circuit reversed a lower court decision which had enjoined a referendum on a "spot" zoning ordinance. Not only did the Court determine that the lower court's findings of racial discrimination were clearly erroneous, but it was concerned with the injunctive relief which was granted prior to the referendum's being held.

**67.** *See Hills v. Gautreaux*, 425 U.S. 284, 303, 96 S.Ct. 1538, 1549, 47 L.Ed.2d 792 (1976).

**68.** *See Acevedo v. Nassau County*, 500 F.2d 1078, 1982 (2d Cir. 1974).

the City, maintaining the segregated character of the City, preventing the construction of housing in which blacks might reside, and deterring developers from proposing and constructing integrated housing. In the opinion of the Court, these acts clearly constitute a pattern and practice of resistance to rights secured by sections 804(a) and 817 of the Fair Housing Act.[69]

In addition to a pattern and practice of violations of rights secured by Sections 804(a) and 817 of the Fair Housing Act, the City of Parma has prevented groups of persons from enjoying those rights. The most obvious victims have been blacks who have been prevented or deterred from obtaining housing in Parma. But the harm from the City's misguided policies has not been limited to "outsiders"; Parma residents also have been denied the right and benefit of inter-racial association guaranteed by the Act. *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). In addition, the Parma residents who are less-well-off and who would qualify for public or low-income housing have been denied such housing because of the City's fears that blacks would move into the City. In short, the actions of the City of Parma in consistently opposing all forms of public or low-income housing and in making construction of such housing economically infeasible, have denied to blacks, needy residents of Parma, and Parma residents generally rights granted by Section 804(a) of the Fair Housing Act.

■ The rights guaranteed under Section 804(a) to white residents and to black non-residents are not the only rights under the Fair Housing Act that the City has violated. By rejecting the Parmatown Woods proposal and by enacting ordinances designed to preclude the construction of low-income housing, the City has interferred with the ability of Forest City Enterprises and other prospective developers to construct integrated housing. This interference by the City with developers attempting to provide equal housing opportunities in Parma is a violation of Section 817 of the Fair Housing Act. *See United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1975); *United States General, Inc. v. City of Joliet*, 432 F.Supp. 346 (N.D.Ill. 1977).

■ In the face of clear violations of the Fair Housing Act, Parma attempts to justify its actions by pointing to the absence of meaningful numbers of blacks on the west side of the Cleveland metropolitan area. The thrust of the argument is that other communities in the Cleveland metropolitan area are segregated and that it would be unfair to single out Parma alone for violations of the Fair Housing Act. This disingenuous argument has been made and rejected too many times to warrant a serious response. Parma cannot be immunized from complying with the provisions of the Fair Housing Act solely because other localities also might have violated the Act. Moreover, the western suburbs of the City of Cleveland are not parties to this case, and no evidence has been submitted to substantiate Parma's allegation that any of the communities on the west side of Cleveland have engaged in the same sort of unlawful conduct.

---

**69.** Considered in isolation, no proof has been adduced that the parking ordinance, Planning and Zoning Code § 1197.03, or the ordinance requiring voter approval of zoning changes, Building Code § 1229.01, were enacted with a racially discriminatory purpose. However, given the entirety of the evidence, an inference can be made that individual actions taken during the period when this policy was in force were done to further that policy. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 362, 97 S.Ct. 1843, 1868, 52 L.Ed.2d 396 (1977). This Court need not draw such inference. These ordinances have had a racially segregative effect. The evidence points to no legitimate interest, in theory or practice, served by the parking ordinance. In theory, there exists legitimate governmental interest behind the ordinance requiring voter approval for zoning changes. Such an interest, however, "must give way to prohibition in the Fair Housing Act that persons shall not be discriminated against on the basis of race." *United States v. Housing Authority of Chickasaw*, Civ. No. 79-0099-14 (S.D.Ala., decided March 7, 1980), p. 33.

Regardless of whether a "racially discriminatory intent" or a "racially discriminatory effects" standard is employed, Parma has violated Sections 804(a) and 817 of the Fair Housing Act. Since the issue of remedy was pretermitted until a finding of liability, the parties are ordered to submit proposed remedies to the Court. The parties also are ordered to consult with one another within thirty days in an effort to reach a remedy they agree upon, which will be submitted to the Court. If no agreement is reached, the parties are ordered to file briefs on the remedy issue within sixty days of the date of this decision. The briefs should set forth the applicable law and detail the proposed remedy. Oral argument on remedy issue will be scheduled if the Court deems it necessary. The parties should bear in mind that the Court's duty is to issue a decree that will so far as possible eliminate the effects of Parma's past violation and ensure future compliance with the Fair Housing Act.

IT IS SO ORDERED.

APPENDIX 1

Central City Districts and Cuyahoga County Communities of More than 25,000 Population in 1970.

## APPENDIX II

## THE "CRILE" SITE

At trial, the government challenged Parma's actions regarding the acquisition and utilization of surplus federal land at the "Crile" site. Because the challenged conduct took place in 1968 before passage of the Fair Housing Act, it cannot constitute an independent violation of the Act. *Cf. Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Nevertheless, this conduct has evidentiary value with respect to the alleged post-Act violations because it sheds some light on Parma's general attitude towards housing opportunities which would have an integrative effect. *Cf., id.* at 309–310, n. 15, 97 S.Ct. at 2742–2743, n. 15.

In January 1968, Mayor Petruska of Parma, Mayor Paul Cassidy of Parma Heights and other officials of the two communities met with representatives of the federal government at the latters' request to discuss a proposal to convey federally-owned land located in Parma and Parma Heights to these municipalities. This land was to be conveyed under a new federal program called "New Town in Town" or "Federal Lands for Urban Community Needs." The program was designed to employ underutilized lands in the federal inventory to promote the expedited construction of racially and economically integrated housing and to provide such housing in conjunction with high-quality facilities (Tr. 499–501). A stated objective of the program was to overcome patterns of segregation that were apparent in many cities (Tr. 501). The "Crile" site was selected by a Special Task Force as one of the primary sites in the

program (Tr. 508), and a team, led by Dorn C. McGrath of the Department of Housing and Urban Development, was sent to meet with officials of Parma and Parma Heights (Tr. 508).

At the meeting, Dr. McGrath explained to the two mayors that the program's objective was to provide housing for people of all income levels, including low and moderate, on an open-occupancy basis, although some industrial or commercial development of the site would also be possible (Tr. 511–513). He stressed that the goal of the program was not to place public housing in the municipalities, but to achieve both economic and racial integration (Tr. 513–518).

Mayor Petruska was opposed to the use of this land to build racially integrated housing.[70] He equated any involvement of Parma in such a program with Parma's contribution to Cuyahoga County's welfare coffers (Tr. 512–513) and said that Parma did not need housing on the "Crile" site or elsewhere (Tr. 512–513, 1329). Instead, he said that Parma needed the site for certain municipal facilities, such as an archery range and a place to put snow removal equipment in the off-season (Tr. 526). The federal officials departed, concluding that any further effort to obtain the cooperation of Parma in utilizing the "Crile" site to provide integrated housing opportunities would be a futile gesture (Tr. 512; Gov. Ex. 35).

Parma contends that its preconceived plans for the "Crile" site mitigate against any finding that resistance to racial integration motivated its rejection of the federal government's proposal to place an inte-

---

**70.** In his deposition taken on January 8, 1974, Mayor Petruska categorically denied that this meeting took place or that he discussed housing with federal officials that year (Petruska dep. 226). It appears that he confused this meeting with a subsequent meeting concerning the "Crile" site held on May 21, 1968, which was unrelated to the January meeting, and which involved another proposed use for the land (Petruska dep. 226–229; Tr. 1329–1330,

1368–1369; Def. Ex. DZ). While Mayor Petruska conceded at the trial that residential use of the land was one of the subjects of the January meeting (Tr. 1327), he denied that low-income or public housing was discussed (Tr. 1328–1329). In view of the Mayor's sparse recollection of the meeting, and in view of the specified purposes of the "New Town in Town" program, the Court finds Dr. McGrath's testimony concerning the meeting credible.

grated "New Town" in Parma. However, the Court finds inescapable the conclusion that Parma chose the alternative that would not have an integrative effect. In this instance, the City chose recreational facilities [71] over integrated housing and was willing to sacrifice the opportunity to ob- tain federal land within the City if it also meant that racially integrated housing might be constructed.

71. The site is presently being used as part of the Cuyahoga Community College complex and for a baseball diamond and other recreational facilities for Parma and Parma Heights (Tr. 1331–1332).